# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | JURY TRIAL DEMANDED |
| SEAN REDCLIFT, individually, | : | |
| and, as ADMINISTRATOR OF THE | : | |
| ESTATE OF STACY REDCLIFT, | : | NO. |
| 43 West Lehigh Street | : | |
| Coaldale, PA 18218 | : | |
| | : | |
| PLAINTIFF | : | |
| | : | |
| VS. | : | |
| | : | |
| SCHUYLKILL COUNTY | : | |
| 401 North Second Street | : | |
| Pottsville, PA  17901 | : | |
| | : | |
| AND | : | |
| | : | |
| SCHUYLKILL COUNTY | : | |
| PRISON BOARD | : | |
| 401 North Second Street | : | |
| Pottsville, PA 17901 | : | |
| | : | |
| AND | : | |
| | : | |
| EUGENE BERDANIER, | : | |
| FORMER WARDEN | : | |
| Schuylkill County Prison | : | |
| 230 Sanderson Street | : | |
| Pottsville, PA  17901 | : | |
| | : | |
| AND | : | |
| | : | |
| PRIMECARE MEDICAL, INC. | : | |
| 3940 Locust Lane | : | |
| Harrisburg, PA  17109 | : | |
| | : | |
| AND | : | |

COALDALE BOROUGH POLICE          :
DEPARTMENT                       :
223 3rd Street                   :
Coaldale, PA 18218               :
                                 :
          AND                    :
                                 :
COALDALE BOROUGH                 :
221 3rd Street                   :
Coaldale, PA 18218               :
                                 :
          AND                    :
                                 :
COALDALE POLICE OFFICER          :
MATTHEW JUNGBAER                 :
221 3rd Street                   :
Coaldale, PA 18218               :
                                 :
          AND                    :
                                 :
JOHN DOE COALDALE POLICE         :
OFFICERS #'s 1 and 2             :
221 3rd Street                   :
Coaldale, PA 18218               :
                                 :
          AND                    :
                                 :
NICOLE HOLLYWOOD, LPN            :
PRIMECARE MEDICAL, INC.          :
3940 Locust Lane                 :
Harrisburg, PA 17109             :
                                 :
          AND                    :
                                 :
ALYSSA HYSOCK, LPN               :
PRIMECARE MEDICAL, INC.          :
3940 Locust Lane                 :
Harrisburg, PA 17109             :
                                 :
          AND                    :

2

                                              :
CAYLA SULLIVAN. LPN                          :
PRIMECARE MEDICAL, INC.                      :
3940 Locust Lane                             :
Harrisburg, PA 17109                         :
                                              :
              AND                            :
                                              :
TARA HAMM, LPN HSA                           :
HEALTH SERVICES ADMINISTRATOR                :
PRIMECARE MEDICAL, INC.                      :
3940 Locust Lane                             :
Harrisburg, PA 17109                         :
                                              :
              AND                            :
                                              :
PAULA DILLMAN-MCGOWAN, CRNP                  :
PRIMECARE MEDICAL, INC.                      :
3940 Locust Lane                             :
Harrisburg, PA 17109                         :
                                              :
              AND                            :
                                              :
NICOLE MACALUSO, CRNP                        :
PRIMECARE MEDICAL, INC.                      :
3940 Locust Lane                             :
Harrisburg, PA 17109                         :
                                              :
              AND                            :
                                              :
CATHARINE GALLE, LPN                         :
PRIMECARE MEDICAL, INC.                      :
3940 Locust Lane                             :
Harrisburg, PA 17109                         :
                                              :
              AND                            :

KIMBERLY RYAN, LPN                    :
PRIMECARE MEDICAL, INC.              :
3940 Locust Lane                     :
Harrisburg, PA 17109                 :
                                     :
        AND                          :
                                     :
CARINA GROSS, LPN                    :
PRIMECARE MEDICAL, INC.              :
3940 Locust Lane                     :
Harrisburg, PA 17109                 :
                                     :
        AND                          :
                                     :
KENDAL JEMIOLA                       :
ASSISTANT REGIONAL MANAGER           :
PRIMECARE MEDICAL, INC.              :
3940 Locust Lane                     :
Harrisburg, PA 17109                 :
                                     :
        AND                          :
                                     :
LT. BARRON LINE                      :
SCHUYLKILL COUNTY PRISON             :
230 Sanderson Street                 :
Pottsville, PA  17901                :
                                     :
        AND                          :
                                     :
C/O JUSTINE GARCIA                   :
SCHUYLKILL COUNTY PRISON             :
230 Sanderson Street                 :
Pottsville, PA  17901                :
                                     :
        AND                          :
                                     :
C/O ROBERT SELGRADE                  :
SCHUYLKILL COUNTY PRISON             :
230 Sanderson Street                 :
Pottsville, PA  17901                :

AND                                          :
                                             :
C/O BRIAN GOTSHALL                           :
SCHUYLKILL COUNTY PRISON                      :
230 Sanderson Street                         :
Pottsville, PA  17901                        :
                                             :
AND                                          :
                                             :
LT. THOMAS HOBAN, JR.                         :
SCHUYLKILL COUNTY PRISON                      :
230 Sanderson Street                         :
Pottsville, PA  17901                        :
                                             :
AND                                          :
                                             :
C/O KYLEE RAUENZAHN                           :
SCHUYLKILL COUNTY PRISON                      :
230 Sanderson Street                         :
Pottsville, PA  17901                        :
                                             :
AND                                          :
                                             :
C/O REBECCA BERGAN                            :
SCHUYLKILL COUNTY PRISON                      :
230 Sanderson Street                         :
Pottsville, PA  17901                        :
                                             :
AND                                          :
                                             :
C/O KASSANDRA CONFER                          :
SCHUYLKILL COUNTY PRISON                      :
230 Sanderson Street                         :
Pottsville, PA  17901                        :
                                             :
AND                                          :

C/O CHRISTOPHER FERTIG     :
SCHUYLKILL COUNTY PRISON    :
230 Sanderson Street       :
Pottsville, PA  17901        :
                              :
        AND         :
                              :

C/O BILLIE JO BENDER       :
SCHUYLKILL COUNTY PRISON    :
230 Sanderson Street       :
Pottsville, PA  17901        :
                              :
        AND         :
                              :

C/O JEFFERY MOYER         :
SCHUYLKILL COUNTY PRISON    :
230 Sanderson Street       :
Pottsville, PA  17901        :
                              :
        AND         :
                              :

C/O WILLIAM SCHWEIKERT    :
SCHUYLKILL COUNTY PRISON    :
230 Sanderson Street       :
Pottsville, PA  17901        :
                              :
        AND         :
                              :

C/O RYAN PARKER           :
SCHUYLKILL COUNTY PRISON    :
230 Sanderson Street       :
Pottsville, PA  17901        :
                              :
        AND         :
                              :

LT. GARY KEPPEL           :
SCHUYLKILL COUNTY PRISON    :
230 Sanderson Street       :
Pottsville, PA  17901        :

```
                AND                     :
                                        :
ELAINE GILBERT                          :
HEALTH SERVICES ADMINISTRATOR           :
FOR MENTAL HEALTH AND                   :
DRUG/ALCOHOL ADMINISTRATION             :
420 N. Centre Street                    :
Pottsville, PA 17901                    :
                                        :
                DEFENDANTS              :
```

## COMPLAINT

AND NOW, comes Plaintiff, Sean Redclift, individually and as the Administrator of the

Estate of Stacy Redclift, by and through his attorneys, Fanelli, Evans, & Patel, P.C., and complains

against the Defendants as follows:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. §1983 and the Fourteenth Amendment

of the United States Constitution. Jurisdiction is based upon 28 U.S.C. §1331 and 1343(a)(1)(3)(4)

and the doctrine of pendant jurisdiction. Plaintiff further invokes supplemental jurisdiction of this

court pursuant to 28 U.S.C. §1367(a) to hear and adjudicate state law claims.

2.      Plaintiff also brings this action on behalf of the estate of the deceased, Stacy

Redclift, under and by virtue of the Pennsylvania Probate, Estate and Fiduciaries Code, 20 Pa. C.S.

§3373 and 42 Pa. C.S. §8301 and 8302.

3.      Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C.

§1391.

## THE PARTIES

4.　　Plaintiff, Sean Redclift ("Mr. Redclift"), is the duly appointed Administrator of the Estate of Stacy Redclift, deceased, having been named and appointed by the Register of Wills for Schuylkill County, and resides at 43 West Lehigh Street, Coaldale, PA 18218.

5.　　Decedent, Stacy Redclift ("Mrs. Redclift"), was a citizen of the United States and the Commonwealth of Pennsylvania, born on May 4, 1971, who committed suicide on January 8, 2020, while an inmate in the custody of the Schuylkill County Prison, Pottsville, Schuylkill County, Pennsylvania.

6.　　Defendant, Schuylkill County ("the County"), is a political subdivision of the Commonwealth of Pennsylvania, duly organized and existing under the laws of the Commonwealth of Pennsylvania with a principal office located at 401 North Second Street, Pottsville, PA, 17901.

7.　　The County operates, supervises, and funds the Schuylkill County Prison and the Schuylkill County Prison Board, and was at all times materially responsible for establishing policies and practices, budgets, hiring and training of employees, contracting for specialty services, and providing other administrative duties relevant to the operation of the Schuylkill County Prison, and employs various other Defendants. The County is sued in its official capacity, and at all times material, was acting under color of state law and authority.

8.　　Defendant, Schuylkill County Prison Board ("the Prison Board"), is a local governmental agency of Defendant, Schuylkill County, and was at all times materially responsible for establishing policies and practices, budgets, hiring and training of employees, contracting for specialty services, and providing other administrative duties relevant to the operation of the

Schuylkill County Prison and employs various other Defendants. The Prison Board is sued in its official capacity, and at all times material, was acting under color of state law and authority.

9.     Defendant, Eugene Berdanier ("Warden Berdanier") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was the Warden of Schuylkill County Prison. Warden Berdanier was responsible for establishing and enforcing policy and procedures at Schuylkill County Prison, and also responsible for hiring, training, and supervision of all correctional and medical staff at Schuylkill County Prison. Warden Berdanier is sued in both his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope and authority of his employment with Defendants, the County and/or the Prison Board.

10.    Defendant, PrimeCare Medical, Inc. (hereinafter "PrimeCare") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal office at 3940 Locust Lane, Harrisburg, PA 17109. At all times relevant, Defendant, PrimeCare provided comprehensive medical and nursing services to the Schuylkill County Prison including staffing and training of prison nursing and medical personnel, formulating and enforcing policy/procedures regarding medical issues and performing daily inmate evaluations among other duties.

11.    At all times relevant, Defendant, PrimeCare acted both directly and through its agents, employees, and ostensible agents, including the individual Defendants, both identified and unidentified.

12.    Defendant, PrimeCare is sued in its official and individual capacities and at all times relevant, was acting under color of state law and authority, and within the course, scope, and

authority of its contractual relationship with the County or the Prison Board, and is both directly liable and vicariously liable for the acts of its employees.

13.     Defendant, Coaldale Borough Police Department ("CPD") is a political subdivision duly organized and existing under the laws of the Commonwealth of Pennsylvania having its principle address of 223 3rd Street, Coaldale, PA 18218. CPD was at all times relevant, responsible for establishing policies and practices, budgets, hiring and training of its police officers and providing other administrative duties relevant to the operation of the CPD and employs various other Defendants. CPD is sued in its official capacity, and at all times material, was acting under color of state law and authority.

14.     Defendant, Coaldale Borough ("the Borough") is a political subdivision duly organized and existing under the laws of the Commonwealth of Pennsylvania having its principle address of 221 3rd Street, Coaldale, PA 18218. The Borough was at all times relevant, responsible for establishing policies and practices, budgets, hiring and training of its police officers and providing other administrative duties relevant to the operation of the CPD and employs various other Defendants. The Borough is sued in its official capacity, and at all times material, was acting under color of state law and authority.

15.     Defendant, Police Officer, Matthew Jungbaer ("Officer Junbaer") is a police officer of the CPD and/or the Borough who was assigned to assess and evaluate Ms. Redclift's well-being prior to arresting her, taking her into custody and transferring her to the Schuylkill County Prison. Defendant is being sued in his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of his employment with the CPD and/or the Borough.

16.     Defendants, John Doe Coaldale Police Officers, 1 and 2, are currently unidentified Police Officers of the CPD and/or the Borough who were assigned to assess and evaluate Ms. Redclift's well-being prior to arresting her, taking her into custody and transferring her to the Schuylkill County Prison. John Doe Coaldale Police Officer 1 and 2 are being sued in their official and individual capacities, and at all times relevant, were acting under color of state law and authority and within the course, scope, and authority of their employment with CPD and/or the Borough.

17.     Defendant, Nicole Hollywood, LPN ("Nurse Hollywood"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse and/or healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Nurse Hollywood is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

18.     Defendant, Alyssa Hysock, LPN ("Nurse Hysock"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse and/or healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Nurse Hysock is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

19.     Defendant, Cayla Sullivan, LPN ("Nurse Sullivan"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse and/or

healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Nurse Hysock is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

20.     Defendant, Tara Hamm, LPN ("Nurse Hamm"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse and/or healthcare professional and/or health services administrator providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Nurse Hamm is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

21.     Defendant, Paula Dillman-McGowan, CRNP ("NP McGowan"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse practitioner and/or healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. NP McGowan is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

22.     Defendant, Nicole Macaluso, CRNP ("NP Macaluso"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse practitioner and/or healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. NP Macaluso is sued in both her

official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

23.     Defendant, Catharine Galle, LPN ("Nurse Galle"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse and/or healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Nurse Galle is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

24.     Defendant, Kimberly Ryan, LPN ("Nurse Ryan"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse and/or healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Nurse Ryan is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

25.     Defendant, Carina Gross, LPN ("Nurse Gross"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a nurse and/or healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Nurse Gross is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within

the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

26.     Defendant, Kendal Jemiola ("Ms. Jemiola"), is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was the assistant regional manager of PrimeCare and/or a healthcare professional providing medical services to inmates, including, but not limited to Ms. Redclift, at the Schuylkill County Prison. Ms. Jemiola is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with either the County, the Prison Board, or PrimeCare.

27.     Defendant, Barron Line ("Lt. Line") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a Lieutenant at the Schuylkill County Prison. Lt. Line was responsible for the management and supervision of correctional officers and staff, ensures that all security and safety standards are met, and oversees inmates in at the Schuylkill County Prison. Lt. Line is sued in both his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope and authority of his employment with the County and/or the Prison Board.

28.     Defendant, Justine Garcia ("CO Garcia") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Garcia was to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms. Redclift. CO Garcia is being sued in her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with the County and/or the Prison Board.

29.     Defendant, Robert Selgrade ("CO Selgrade") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Selgrade was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms. Redclift. CO Selgrade is being sued in his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of his employment with the County and/or the Prison Board.

30.     Defendant, Brian Gotshall ("CO Gotshall") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Gotshall was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including decedent, Stacy Redclift. CO Gotshall is being sued in his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of his employment with the County and/or Prison Board.

31.     Defendant, Thomas Hoban ("Lt. Hoban") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a Lieutenant at the Schuylkill County Prison. Lt. Hoban was responsible for the management and supervision of correctional officers and related support staff, ensures that all security and safety standards are met, and oversees inmates in at the Schuylkill County Prison. Lt. Hoban is sued in both his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope and authority of his employment with the County and/or the Prison Board.

32.     Defendant, Kylee Rauenzahn ("CO Rauenzahn") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Rauenzahn was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms. Redclift. CO Rauenzahn is being sued in her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with the County and/or the Prison Board.

33.     Defendant, Rebecca Bergan ("CO Bergan") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Bergan was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms.  Redclift. CO Bergan is being sued in her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with the County and/or the Prison Board.

34.     Defendant, Kassandra Confer ("CO Confer") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Confer was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms.  Redclift. CO Confer is being sued in her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with the County and/or the Prison Board.

35.     Defendant, Christopher Fertig ("CO Fertig") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer

at the Schuylkill County Prison. CO Fertig was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms.  Redclift. CO Fertig is being sued in his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of his employment with the County and/or the Prison Board.

36.     Defendant, Billie Jo Bender ("CO Bender") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Bender was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms.  Redclift. CO Bender is being sued in her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of her employment with the County and/or the Prison Board.

37.     Defendant, Jeffery Moyer ("CO Moyer") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Moyer was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms.  Redclift. CO Moyer is being sued in his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of his employment with the County and/or the Prison Board.

38.     Defendant, William Schweikert ("CO Schweikert") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Schweikert was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms.  Redclift.

CO Schweikert is being sued in his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of his employment with the County and/or the Prison Board.

39.     Defendant, Ryan Parker ("CO Parker") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a correctional officer at the Schuylkill County Prison. CO Parker was assigned to supervise and care for inmates on B-Block at the Schuylkill County Prison at all times relevant, including Ms. Redclift. CO Parker is being sued in his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope, and authority of his employment with the County and/or the Prison Board.

40.     Defendant, Gary Keppel ("Lt. Keppel") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was a Lieutenant at the Schuylkill County Prison. Lt. Keppel was responsible for the management and supervision of correctional officers and related support staff, ensures that all security and safety standards are met, and oversees inmates in at the Schuylkill County Prison. Lt. Keppel is sued in both his official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope and authority of his employment with the County and/or the Prison Board.

41.     Defendant, Elaine Gilbert ("Ms. Gilbert") is a citizen of the United States and the Commonwealth of Pennsylvania, who, at all times relevant hereto, was the Human Services Administrator for the Schuylkill County Prison. Defendant was responsible for the overall administration and provision of comprehensive medical services, including mental health services, to inmates incarcerated within the Schuylkill County Prison. Ms. Gilbert was also responsible for

staffing and training of prison nursing and medical personnel, formulating and enforcing policy/procedures regarding medical issues and performing daily inmate evaluations among other duties. Ms. Gilbert is sued in both her official and individual capacities, and at all times relevant, was acting under color of state law and authority and within the course, scope and authority of her employment with the County and/or the Prison Board.

## **FACTS OF THE CASE**

42.     At all times relevant, Mrs. Redclift, was 48 years old, married and a resident of Coaldale, Schuylkill County, PA.

43.     At all times relevant, Ms.  Redclift was the wife of Sean Redclift and mother of three children, Savannah Williams, Hailey Redclift and Alexander Redclift.

44.     At all times relevant, prior to the incident Mrs. Redclift was diagnosed with psychiatric issues, including but not limited to bipolar disorder, post-traumatic stress disorder, severe depression, anxiety and had two (2) previous suicide attempts.

45.     On or about January 6, 2020 at approximately 3:15 a.m., Mrs. Redclift was involved in a domestic dispute with her husband, Sean Redclift and son, Alexander Redclift at her home.

46.     Upon information and belief, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 responded to the domestic dispute and placed Mrs. Redclift into custody due to her allegedly erratic and non-compliant behavior.

47.     Shortly thereafter, Mrs. Redclift was arraigned and released to her mother's house on unsecured bail.

48.     Instead of staying at her mother's home, Mrs. Redclift returned to the Redclift home at which time she again allegedly exhibited erratic and non-compliant behavior.

49.     Upon information and belief, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 again responded to the Redclift home, arrested Mrs. Redclift, and immediately transported her to the Schuylkill County Prison. This was the first time that Mrs. Redclift had ever been incarcerated.

50.     It is believed and therefore averred that Sean and Alexander Redclift advised Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 that Mrs. Redclift had a history of mental illness, psychotic episodes, suicide attempts/tendencies, and psychiatric hospitalizations prior to the time they transported her from her home to the Schuylkill County Prison.

51.     It is believed and therefore averred that prior to arresting, transporting and leaving Mrs. Redclift at the Schuylkill County Prison, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 failed to properly assess her mental state of mind to determine if she was in need of medical care, medical assistance, or whether she was a suicide risk, despite the fact that they were informed by Mrs. Redclift's family that she had a history of mental illness, psychotic episodes, erratic behavior, suicide attempts/tendencies, and psychiatric hospitalizations.

52.     It is believed and therefore averred that prior to arresting, transporting and leaving Mrs. Redclift at the Schuylkill County Prison, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 failed to communicate or inform either the Schuylkill County Prison and its employees, agents, ostensible agents and corrections officers, or PrimeCare and its employees, agents, contractors, and/or ostensible agents of Mrs. Redclift's history of mental illness, psychotic episodes, erratic behavior, suicide attempts/tendencies, and/or the concerns raised by her family, and failed to ensure that the requisite precautions or safety measures against suicide were taken, despite the fact that they were informed by Mrs. Redclift's family that she had a history of mental

illness, psychotic episodes, erratic behavior, suicide attempts/tendencies, and psychiatric hospitalizations.

53.     It is believed and therefore averred that prior to arresting, transporting and leaving Mrs. Redclift at the Schuylkill County Prison, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 knew or should have known that Mrs. Redclift had a particular vulnerability to suicide and deliberately ignored that risk by failing to: (i) follow procedures, customs, and/or protocols designed to assess and identify arrestees with mental illness and suicide risk; (ii) follow procedures, customs, and/or protocols designed to ensure that the Schuylkill County Prison and PrimeCare were made aware of and understood an arrestee's mental illnesses and/or suicide risks; and (iii) ensure that Mrs. Redclift was placed in the proper mental institution and/or on suicide watch when the need to do so should have been known and obvious, all of which occurred at a time when they knew or should have known of Mrs. Redclift's history of mental illness, psychotic episodes, erratic behavior, suicide attempts/tendencies, and psychiatric hospitalizations.

54.     On January 6, 2020, upon her arrival at the Schuylkill County Prison, Mrs. Redclift, who was a pre-trial detainee, was processed and booked at approximately 12:11 p.m. by employees, agents, and/or ostensible agents of Defendants, PrimeCare, the County and/or the Prison Board.

55.     Throughout the day of January 6, 2020 into January 7, 2020, while incarcerated at the Schuylkill County Prison Mrs. Redclift underwent influenza, suicide, mental health, drug use, and medication verification screenings, which were ordered and administered by nursing and prison staff who, upon information and belief, were employees, agents, and/or ostensible agents of Defendants, PrimeCare, the County, and/or the Prison Board.

56.     Upon information and belief, on or about January 6, 2020 at approximately 1:51 p.m., Defendant, Nurse Hysock, performed a medication verification of Mrs. Redclift.  At that time, although Nurse Hysock ordered various prescription medications for Mrs. Redclift, she failed to order Mrs. Redclift the psychotropic drug Paxil, which Mrs. Redclift had been prescribed prior to her arrest and detention at the Schuylkill County Prison.

57.     Defendant, Nurse Macalusos, subsequently approved Nurse Hysock's medication orders without the inclusion of Paxil.

58.     Thereafter, in the early morning hours of January 7, 2020, Defendant, Nurse Hollywood, administered a mental health and suicide screening of Mrs. Redclift.

59.     The mental health screening indicated that Mrs. Redclift required further psychiatric evaluation, which, upon information and belief, was never performed.

60.     The suicide screening performed by Nurse Hollywood included questions about whether Mrs. Redclift had any previous suicide attempts, whether she had family support in the community, whether the arresting officer believed her to be a suicide risk, and whether she had ever been hospitalized at a result of mental illness.

61.     It is believed and therefore averred that Nurse Hollywood incorrectly completed the suicide screening by either: (i) failing to ask or obtain from Officer Jungbaer, John Doe Coaldale Police Officer 1, John Doe Coaldale Police Officer 2, or Mrs. Redclift herself the appropriate, relevant information; or (ii) failing to accurately appreciate, report, or record the information given to her by Officer Jungbaer, John Doe Coaldale Police Officer 1, John Doe Coaldale Police Officer 2, or Mrs. Redclift.

62.     Upon information and belief, during the course of Nurse Hollywood's screening of Mrs. Redclift, Mrs. Redclift advised that: (i) she suffered from post-traumatic stress disorder,

depression, and bipolar disorder-type 2; (ii) she had a history of suicide attempts; (iii) she had been committed to numerous psychiatric hospitals throughout her life; (iv) she was currently under the care of a psychiatrist for her mental health disorders; (v) she was currently on medication for mental illness; and (vi) that she felt the need to treat with a mental health provider in the Schuylkill County Prison at that time.

63.     At approximately 4:07 a.m. on January 7, 2020, Defendant, Hollywood reviewed and verified Mrs. Redclift's screenings and medication verification forms.

64.     Upon information and belief, on January 7, 2020, it was discovered that Paxil had mistakenly not been ordered for Mrs. Redclift, although she was on 30mg of the drug prior to entering the Schuylkill County Prison.

65.     It is believed and therefore averred that although Defendant, NP McGowan, eventually ordered Paxil for Mrs. Redclift on January 7, 2020, the order was never approved and, consequently, the medication was never administered to Mrs. Redclift during her incarceration.

66.     It is believed and therefore averred that at approximately 10:00 a.m. on January 7, 2020, Defendant, Lt. Line, received a call from Mrs. Redclift's son indicating that she had been calling her husband and that he and his father wanted her to stop calling or they would press harassment charges. Lt. Line advised that Mrs. Redclift would be told not to call them.

67.     It is believed and therefore averred that Mrs. Redclift was subsequently told that she needed to stop calling her husband and son because they did not want to talk to her.

68.     It is believed and therefore averred that after this conversation, Mrs. Redclift's mental state, emotional state, or suicide risk factors were never re-evaluated, nor were any additional precautions taken to guard against or prevent Mrs. Redclift from attempting or committing suicide.

23

69.     It is believed and therefore averred that around 8:00 p.m. on January 7, 2020, Defendant, Nurse Gross, attempted to administer Mrs. Redclift's medications to her, but Mrs. Redclift refused.

70.     It is believed and therefore averred that after this refusal, Mrs. Redclift's mental state, emotional state, or suicide risk factors were never re-evaluated, nor were any additional precautions taken to guard against or prevent Mrs. Redclift from attempting or committing suicide.

71.     It is believed and therefore averred that at approximately 11:04 p.m. on the evening of January 7, 2020, Mrs. Redclift's cellmate, Kim Leary, awoke from sleeping to use the restroom and discovered Mrs. Redclift with a noose, made out of shoelaces, around her neck.

72.     Schuylkill County Prison Corrections Officers and PrimeCare staff responded to the cell and found Mrs. Redclift unresponsive.

73.     EMS personnel arrived at the Schuylkill County Prison and advised that Mrs. Redclift was not showing any signs of life. EMS subsequently transported Mrs. Redclift to the Lehigh Valley East Norwegian Street.

74.     Mrs. Redclift remained at Lehigh Valley Hospital where she was later pronounced deceased on January 8, 2020.

75.     On January 9, 2020, an autopsy was performed by Forensic Pathologist Barbara Bollinger in Lehigh County. Based on the autopsy findings, Dr. Bollinger concluded that the cause of death was "strangulation."

76.     At the time that Mrs. Redclift hung herself, she was under the care and supervision of Defendants: the County; the Prison Board; Warden Berdanier; PrimeCare; Nurse Hollywood; Nurse Hysock; Nurse Sullivan; Nurse Hamm; NP McGowan; NP Macaluso; Nurse Galle; Nurse Ryan; Nurse Gross; Ms. Jemiola; Lt. Line; CO Garcia; CO Selgrade; CO Gotshall; Lt. Hoban; CO

Rauenzahn; CO Bergan; CO Confer; CO Fertig; CO Bender; CO Moyer; CO Parker; Lt. Keppel; CO Schweikert, and Ms. Gilbert, all of whom knew or had reason to know that Mrs. Redclift: (i) would likely suffer negative psychological and emotional effects due to the mere fact of her incarceration and confinement in prison; (ii) had a history of mental illness; (iii) presently suffered from mental health issues; (iv) was being prescribed medication for mental illness; (v) had been admitted to psychiatric institutions in the past; (vi) had a history of suicide attempts; (vii) had screened as warranting further mental health/suicide evaluation in the Schuylkill County Prison; (viii) had felt she needed to be seen by a mental health professional in the Schuylkill County Prison; (ix) had had a significant change in circumstance since her incarceration, *i.e.*, her family support system was withdrawn; (x) she was not administered prescribed medication; and (xi) had refused to take medication that was administered to her. As a result thereof, these Defendants knew or should have known that Mrs. Redclift was particularly vulnerable to suicide and that there was a strong likelihood that she would attempt suicide. Nonetheless, these Defendants failed to take any action to provide Mrs. Redclift with adequate care, supervision, medication and/or treatment, or to guard against or prevent her from committing suicide.

77.     Upon information and belief, all Defendants knew prior to the aforementioned date that the certain persons, especially persons who are under severe emotional stress, depressed, exhibited anxiety would exhibit mentally disturbed and/or suicidal behavior that would require immediate, specialized care and/or supervision including being placed on suicide watch.

78.     Upon information and belief, all Defendants knew that safe and effective means of preventing arrestees and/or detainees from attempting or committing suicide exist, including but not limited to ensuring that they were transported to the proper institution and/or facility for care and treatment.

79.     Upon information and belief, all Defendants knew that safe and effective means of preventing arrestees and/or detainees from attempting or committing suicide exist including but not limited to removal of potential implements used to commit suicide (clothing, sheets, shoe laces), tape visual monitoring, actual observation and/or immediate referral of the person to a psychiatric facility instead of leaving the person unhandcuffed in a cell with implements with which to commit suicide.

80.     Upon information and belief, all Defendants knew of the importance of creating, implementing, enforcing and following procedures and protocols to: (i) timely and accurately evaluate and assess arrestees/inmates with mental illness and/or suicide risks; (ii) timely and accurately identify arrestees/inmates with mental illness and/or suicide risks; (iii) timely and accurately communicating an arrestee's/inmate's mental illness or suicide risk factors to those in charge of caring for the arrestee/inmate; (iv) ensure that proper precautions are taken to guard against or prevent arrestees/inmates with mental illness/suicide risks from attempting to commit suicide; (v) timely and accurately re-evaluate an arrestee or inmate for mental illness/suicide risks when risk factors change; (vi) timely and accurately provide additional care to an arrestee or inmate whose risk factors have changed; (vii) appropriately supervise and monitor arrestees and inmates; and (viii) train those individuals responsible for the care and welfare of arrestees/inmates as to how to effectively do so.

81.     Upon information and belief, the Defendants failed to create, implement, enforce, or follow said policies or procedures, and their failure to do so under the circumstances constitutes not only negligence but deliberate indifference to Mrs. Redclift's constitutionally protected rights and to her serious mental health issues and medical needs, including but not limited to the risk of suicide.

82.     Upon information and belief, the Defendants' failure to train those individuals responsible for arrestee/inmate care, custody, and welfare on how to properly assess, evaluate, and care for an arrestee/inmate with mental illness and/or suicide risks, under the circumstances, constitutes not only negligence but deliberate indifference to Mrs. Redclift's constitutionally protected rights and to her serious mental health issues and medical needs.

83.     Upon information and belief, the failure of the Defendants to take the proper steps to appropriately guard against and prevent Mrs. Redclift from attempting and committing suicide constitutes not only negligence but deliberate indifference to Mrs. Redclift's constitutionally protected rights and to her serious mental health issues and medical needs.

84.     As a result of Defendants' conduct, it was a foreseeable consequence that Mrs. Redclift, left unattended and with access to potential implements commonly used to commit suicide, would actually attempt to harm herself and/or pose a threat to her own life.

85.     As a result of Defendants' conduct, Mrs. Redclift, did actually attempt to harm herself and ultimately succeeded in killing herself.

86.     If it were not for the Defendants' aforementioned conduct, particularly their deliberate indifference to Mrs. Redclift's serious medical needs and predisposition to suicide,

Mrs. Redclift would not have attempted or been able to commit suicide.

87.     As a direct and proximate result of the above deliberate indifference of Defendants, the Mrs. Redclift suffered enormous emotional pain and physical suffering and committed suicide thereby suffering complete loss of earnings and earning capacity.

88.     As a direct and proximate result of the actions of Defendants, Mrs. Redclift's family and her estate have and will continue to suffer emotional pecuniary loss and damages including but not limited to loss of companionship, wages/loss of income and benefits.  It is believed and

therefore averred that prior to the suicide of Ms. Redclift there were several other suicides at this facility.

## COUNT I

## PLAINTIFF VS. OFFICER JUNGBAER AND JOHN DOE COALDALE POLICE OFFICERS 1 AND 2

## DELIBERATE INDIFFERENCE TO MRS. REDCLIFT'S SERIOUS MEDICAL NEEDS AND TO HER KNOWN RISK OF SUICIDE PURSUANT TO THE FOURTEENTH AMENDMENT AND 42 U.S.C. §1983

89.     Paragraphs 1 through 88, above, are fully incorporated by reference.

90.     Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 were responsible for ensuring the health, safety and well-being of arrestees/detainees/inmates placed under their custody and control, including but not limited to Mrs. Redclift, and were responsible for complying with and following appropriate policies, procedures and practices designed to carry out this function.

91.     On January 6, 2020, prior to the time they transported her from her home to the Schuylkill County Prison, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 knew and/or should have known that Mrs. Redclift had a history of mental illness, psychotic episodes, suicide attempts/tendencies, and psychiatric hospitalizations, and that she was currently treating for mental illness and was on medication for the same.

92.     Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 knew and/or should have known that an arrestee/detainee/inmate in Mrs. Redclift's present mental state and with her history of mental health issues and treatment should be considered a high-risk, suicidal inmate while incarcerated.

93.     Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 knew and/or should have known that an arrestee/detainee/inmate in Mrs. Redclift's state and with her history

of mental health issues and treatment would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated, was susceptible to attempting and/or committing suicide, and would likely attempt to harm themselves or to attempt suicide.

94.     It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior history of mental illness and suicide attempts, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 knew and/or should have known that: (i) inmates like Mrs. Redclift would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated; (ii) inmates like Mrs. Redclift were susceptible to attempting and/or committing suicide; and (iii) that inmates like Mrs. Redclift would likely attempt to harm themselves or to attempt suicide.

95.     It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior history of mental illness and suicide attempts, Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 knew and/or should have known that proper precautions were necessary to guard against and prevent the possibility that Mrs. Redclift would attempt to harm herself or commit suicide.

96.     Based on the above, it is believed and therefore averred that Officer Jungbaer and John Doe Coaldale Police Officers 1 and 2 acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide in the following ways:

a.   Failing to follow procedures, customs, and/or protocols designed to assess, identify, and protect arrestees with mental illness and suicide risk;

b.   Failing to follow procedures, customs, and/or protocols designed to ensure that the Schuylkill County Prison and PrimeCare were made aware of and understood an arrestee's mental illnesses and/or suicide risks;

c.  Failing to appreciate the risks of self-harm and suicide posed by her current mental state, her current medical treatment, and her prior history of mental illness and suicide attempts;

d.  Failing to accurately, appropriately, and timely evaluate and assess Mrs. Redclift's medical needs, including but not limited to risk of suicide and self-harm;

e.  Failing to accurately, appropriately, and timely ensure that Mrs. Redclift's medical needs were met while in their custody;

f.  Failing to transport Mrs. Redclift to a facility, other than the Schuylkill County Prison, that was better equipped to evaluate, assess, and treat her mental condition, mental illness, and which could better prevent her from attempting self-harm and/or suicide;

g.  Failing to accurately, appropriately, and timely communicate to nurses and prison personnel at the Schuylkill County Prison the concerns raised by Mrs. Redclift's family about her mental condition and her suicide risks;

h.  Failing to accurately, appropriately, and timely communicate to nurses and prison personnel at the Schuylkill County Prison other factors relevant to the evaluation and assessment of Mrs. Redclift's mental condition and her suicide risks;

i.  Failing to recommend to nurses and prison personnel at the Schuylkill County Prison that Mrs. Redclift be kept on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide;

j.  Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide;

k.  Failing to do any of the acts alleged in Paragraph 80, above;

l.  Failing to follow established policies, procedures, practices, and customs designed to achieve any of the foregoing objectives articulated in the subparagraphs, above;

97.  As a direct and proximate result of Defendants' deliberate indifference to Mrs. Redclift's constitutional rights, as set forth herein, she was provided with the opportunity to commit self-harm within the Schuylkill County Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death from hanging.

98.     The actions of all named Defendants manifested a deliberate indifference to Mrs. Redclift's constitutional rights in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

### COUNT II

### PLAINTIFF VS. COALDALE BBOROUGH POLICE DEPARTMNET AND COALDALE BOROUGH

### DELIBERATE INDIFFERENCE TO CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983 CUSTOM, PATTERN, PRACTICE, POLICY, TRAINING

99.     Paragraphs 1 through 98, above, are incorporated by reference.

100.    Defendants, the Borough and the CPD, were responsible for ensuring the health, safety and well-being of arrestees/detainees/inmates placed under the custody and control of their police officers.

101.    Defendants, the Borough and CPD, were responsible for creating, establishing, implementing, and enforcing appropriate policies, procedures, practices, and customs designed to ensure the health, safety and well-being of arrestees/detainees/inmates placed under the custody and control of their police officers.

102.    Defendants, the Borough and CPD, were responsible for training their police officers on the appropriate ways to best ensure compliance with the aforementioned policies, procedures, practices, and customs so that it could ensure the health, safety and well-being of arrestees/detainees/inmates placed under the custody and control of their police officer.

31

103.   Defendants, the Borough and CPD, were responsible for training their police officers on the appropriate ways to best ensure the health, safety and well-being of arrestees/detainees/inmates placed under the custody and control of their police officer.

104.   Defendants, the Borough and CPD, through their relevant decision and policy makers, knew and/or should have known that an arrestee/detainee/inmate with a history of mental health issues and treatment, with a history of suicide attempts, and who was presently treating for mental health issues should be considered a high-risk, suicidal inmate while incarcerated.

105.   Defendants, the Borough and CPD, through their relevant decision and policy makers, knew and/or should have known that an arrestee/detainee/inmate with a history of mental health issues and treatment, with a history of suicide attempts, and who was presently treating for mental health issues would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated, was susceptible to attempting and/or committing suicide, and would likely attempt to harm themselves or to attempt suicide.

106.   It is believed and therefore averred that based upon the Defendant's institutional knowledge and the training, education, knowledge, and experience of their decision and policy makers, the Borough and the CPD knew and/or should have known that failing to create, establish, implement, and enforce appropriate policies, procedures, practices, and customs designed to ensure the health, safety and well-being of arrestees/detainees/inmates placed under the custody and control of their police officers, and failing to train their police officers thereon, would jeopardize the health, safety and welfare of their arrestees/detainees/inmates and would lead to self-harm and suicide in some circumstances.

107.   Despite the foregoing, Defendants, the Borough and CPD, were deliberately indifferent to the medical needs and constitutional rights of their arrestees/detainees/inmates, like

Mrs. Redclift, and otherwise failed to ensure the health, safety, and welfare of those arrestees/detainees/inmates in the following ways:

a. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to ensure the health, safety and well-being of arrestees/detainees/inmates placed under the custody and control of their police officers, and/or, in the alternative, failing to properly and adequately train their police officers thereon;

b. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to ensure the health, safety and well-being of arrestees/detainees/inmates after they left the custody and control of their police officers, and/or, in the alternative, failing to properly and adequately train their police officers thereon;

c. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to timely and accurately assess and identify arrestees with mental illness and suicide risk, and/or in the alternative, failing to properly and adequately train their police officers thereon;

d. Failing to train their police officers on how to timely, thoroughly, appropriately and accurately evaluate and assess an arrestee's mental status and risk for self-harm and/or suicide;

e. Failing to train their police officers on how to timely, thoroughly, appropriately and accurately identify, appreciate, and evaluate an arrestee's risk factors for self-harm and suicide;

f. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs dictating how to safely and appropriately manage and transport an arrestee who manifests risk factors for self-harm and suicide;

g. Failing to train their police officers on how to safely and appropriately manage and transport an arrestee who manifests risk factors for self-harm and suicide;

h. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to ensure that the Schuylkill County Prison and PrimeCare were made aware of and understood an arrestee's mental illnesses and/or suicide risks, and/or in the alternative, failing to properly and adequately train their police officers thereon;

i. Failing train their police officers to accurately and timely communicate all relevant mental health, self-harm risk factors, suicide risk factors, and concerns expressed by the family to a committing institution, like the Schuylkill County Prison, after an arrestee, like Mrs. Redclift, is transported there;

j.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring police officers to recommend that an arrestee be placed on suicide watch when the risk of self-harm or suicide is obvious, or in the alternative failing to adequately train their police officers thereon;

k.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring police officers to ensure that an arrestee is placed on suicide watch when the risk of self-harm or suicide is obvious, or in the alternative failing to adequately train their police officers thereon;

l.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring police officers to ensure transport of at-risk arrestees to a facility, other than the Schuylkill County Prison, better equipped to evaluate, assess, and treat mental illnesses, self-harm risk factors, and suicide risk factors, prior to being transported to prison, or in the alternative failing to adequately train their police officers thereon;

m.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs to achieve any of the objectives articulates in Paragraphs, 80, 81, or the subparagraphs of Paragraph 96, above;

108.   Based on the above, it is believed and therefore averred that Defendants, the Borough and CPD, acted with deliberate indifference to Ms. Redclift's constitutional rights by having a known custom, pattern, practice, and/or policy of inadequate assessment, evaluation, observation and supervision of detainees/inmates in their care, custody and control, including those who are suffer with mental health difficulties such as Ms. Redclift.

109.   Based on the above, it is believed and therefore averred that Defendants, the Borough and CPD, acted with deliberate indifference to Ms. Redclift's constitutional rights by having a known custom, pattern, practice, and/or policy of permitting inadequate evaluation, training, and supervision of their police officers.   Specifically, Defendants' supervisory or administrative staff had a custom, pattern, practice, and/or policy of failing to ensure that the police officers provided adequate and thorough monitoring, observation, evaluation, and assessment of Ms. Redclift as she suffered with mental health disorders.

110.    It is believed and therefore averred that the aforementioned lack of proper supervision, monitoring, evaluation, and assessment of arrestees/detainees was so wide spread and pervasive that it developed into a customary practice, of which Defendants were aware of and condoned.

111.    The violations of Ms. Redclift's constitutional rights as set forth within, were a highly predictable, and even expected, consequence of the failures to train the Borough and CPD's police officers.

112.    As a direct and proximate result of Defendants' deliberate indifference to Ms. Redclift's constitutional rights, as set forth herein, Ms. Redclift was provided with the opportunity to commit self-harm and suicide while incarcerated within the Schuylkill County Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death from hanging.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

## COUNT III

### PLAINTIFF V. NURSE HOLLYWOOD, NURSE HYSOCK, NURSE SULLIVAN, NURSE HAMM, NP McGOWAN, NP MACALUSO, NURSE GALLE, NURSE RYAN, NURSE GROSS, and MS. JEMIOLA

### DELIBERATE INDIFFERENCE TO MRS. REDCLIFT'S SERIOUS MEDICAL NEEDS AND TO HER KNOWN RISK OF SUICIDE PURSUANT TO THE FOURTEENTHAMENDMENT AND 42 U.S.C. §1983

113.    Paragraphs 1 through 112, above, are fully incorporated by reference.

114.    At all relevant times, Defendant, PrimeCare, was contracted to provide comprehensive medical services to the Schuylkill County Prison, which included but was not

limited to the staffing and training of prison nursing and medical personnel; the formulation and enforcement of policy/procedures regarding medical issues; the performance of daily inmate assessment and evaluations; the diagnosing, treatment, and prevention of medical illness among the prison population; the prevention of suicide attempts by the prison population; and ensuring the overall health, safety and well-being of the prison population.

115.    At all relevant times, Nurse Hollywood, Nurse Hysock, Nurse Sullivan, Nurse Hamm, NP McGowan, NP Macaluso, Nurse Galle, Nurse Ryan, Nurse Gross, and Ms. Jemiola (collectively referred to as "Medical Staff Defendants") were all employees, agents, ostensible agents, and/or contractors of Defendant, PrimeCare, and worked in such capacities at the Schuylkill County Prison.

116.    At all relevant times, in their capacity as employees, agents, ostensible agents, and/or contractors of Defendant, PrimeCare working at the Schuylkill County Prison, the Medical Staff Defendants had the responsibility of diagnosing, treating, and preventing medical illness among the prison population, as well as the responsibility of ensuring the overall health, safety and well-being of the prison population.

117.    At all relevant times, in their capacity as employees, agents, ostensible agents, and/or contractors of Defendant, PrimeCare working at the Schuylkill County Prison, the Medical Staff Defendants had the responsibility of assessing and evaluating inmates for mental illness and suicide risks.

118.    At all relevant times, in their capacity as employees, agents, ostensible agents, and/or contractors of Defendant, PrimeCare working at the Schuylkill County Prison, the Medical Staff Defendants had the responsibility of preventing inmate suicide.

119.    At all relevant times, in their capacity as employees, agents, ostensible agents, and/or contractors of Defendant, PrimeCare working at the Schuylkill County Prison, the Medical Staff Defendants were responsible for complying with and following appropriate policies, procedures and practices designed to carry out the duties and responsibilities identified above.

120.    It is believed and therefore averred that the Medical Staff Defendants were working at the Schuylkill County Prison during Mrs. Redclift's incarceration and therefore had the foregoing responsibilities towards her.

121.    It is believed and therefore averred that at all relevant times, the Medical Staff Defendants knew and/or should have known that Mrs. Redclift had a history of mental illness, psychotic episodes, suicide attempts/tendencies, and psychiatric hospitalizations prior to the time she was incarcerated at the Schuylkill County Prison, and that she was currently treating for mental illness and was on medication for the same.

122.    It is believed and therefore averred that at all relevant times, the Medical Staff Defendants knew and/or should have known that an arrestee/detainee/inmate in Mrs. Redclift's present mental state and with her history of mental health issues and treatment should be considered a high-risk, suicidal inmate while incarcerated.

123.    It is believed and therefore averred that at all relevant times, the Medical Staff Defendants knew and/or should have known that an arrestee/detainee/inmate in Mrs. Redclift's state and with her history of mental health issues and treatment would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated, was susceptible to attempting and/or committing suicide, and would likely attempt to harm themselves or to attempt suicide.

124.    It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior

history of mental illness and suicide attempts, the Medical Staff Defendants knew and/or should have known that: (i) Mrs. Redclift would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated; (ii) she was susceptible to attempting and/or committing suicide; and (iii) that she would likely attempt to harm herself or to attempt suicide.

125.   It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior history of mental illness and suicide attempts, the Medical Staff Defendants knew and/or should have known that a thorough, proper, and timely evaluation of Mrs. Redclift's risk of self-harm and suicide was necessary to guard against and prevent the possibility that Mrs. Redclift would attempt to harm herself or commit suicide.

126.   It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior history of mental illness and suicide attempts, the Medical Staff Defendants knew and/or should have known that implementing the appropriate precautions indicated by the self-harm/suicide evaluation was necessary to guard against and prevent the possibility that Mrs. Redclift would attempt to harm herself or commit suicide.

127.   Based on the above, it is believed and therefore averred that Nurse Hollywood acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide by:

    a.   Failing to follow procedures, customs, and/or protocols designed to assess and identify arrestees with mental illness and suicide risk;

    b.   Failing to follow procedures, customs, and/or protocols designed to ensure that the Schuylkill County Prison and its employees, agents, ostensible agents, and contractors were made aware of and understood an arrestee's mental illnesses and/or suicide risks;

c.  Failing to follow procedures, customs, and/or protocols requiring accurate and timely documentation of inmate's medical needs and the steps taken to appropriately attend to those needs;

d.  Failing to appreciate the risks of self-harm and suicide posed by Mrs. Redclift's current mental state, her current medical treatment, and her prior history of mental illness and suicide attempts;

e.  Failing to accurately, appropriately, and timely evaluate and assess Mrs. Redclift's medical needs, including but not limited to her risk of suicide and self-harm, when the need for the same was apparent;

f.  Failing to timely implement the appropriate measures necessary to prevent Mrs. Redclift from attempting self-harm or suicide, when the need for the same was apparent;

g.  Failing to accurately, appropriately, and timely document the factors relevant to Mrs. Redclift's risks of suicide and self-harm, when the need for the same was apparent;

h.  Failing to accurately, appropriately, and timely document the factors relevant to Mrs. Redclift's mental illness, when the need for the same was apparent;

i.  Failing to accurately, appropriately, and timely ensure that Mrs. Redclift underwent a subsequent mental health evaluation after her mental health assessment of Mrs. Redclift indicated the need for the same, when the need for the same was apparent;

j.  Failing to accurately, appropriately, and timely ensure that Mrs. Redclift saw a mental health provider at the Schuylkill County Prison after her mental health assessment of Mrs. Redclift indicated the need for the same, when the need for the same was apparent;

k.  Failing to accurately, appropriately, and timely communicate to nurses and prison personnel at the Schuylkill County Prison other factors relevant to the evaluation and assessment of Mrs. Redclift's mental condition and her suicide risks, when the need for the same was apparent;

l.  Failing to recommend to nurses and prison personnel at the Schuylkill County Prison that Mrs. Redclift be kept on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, when the need for the same was apparent;

m.  Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, when the need for the same was apparent;

n.  Failing to ensure that Mrs. Redclift was not placed in a cell with implements, such as shoe laces, with which she could hang herself, when the need for the same was apparent;

o.  Failing to ensure that Mrs. Redclift was restrained in her cell in a manner that would have prevented her from hanging herself, when the need for the same was apparent;

p.  Failing to ensure that Mrs. Redclift was placed in a cell where she could not hang herself, when the need for the same was apparent;

q.  Failing to ensure that Mrs. Redclift was being given the appropriate medications, including but not limited to Paxil, when the need for the same was apparent;

r.  Failing to recommend and/or ensure that there be a reassessment of Mrs. Redclift's mental health and suicide risks after she knew or should have known that Mrs. Redclift had missed multiple doses of Paxil;

s.  Failing to follow procedures, customs, and/or protocols on how to appropriately respond when an inmate misses one or more doses of a psychotropic medication;

t.  Failing to follow procedures, customs, and/or protocols designed to assess and determine what precautions should be taken when an inmate misses one or more doses of a psychotropic medication;

u.  Failing to do any of the acts alleged in Paragraph 80, above;

v.  Failing to follow established policies, procedures, practices, and customs designed to achieve any of the objectives in any of the above subparagraphs;

128.  Based on the above, it is believed and therefore averred that Nurse Hysock acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide by:

a.  Failing to follow procedures, customs, and/or protocols designed to assess and determine the medications that inmates such as Mrs. Redclift were prescribed prior to being incarcerated;

b.  Failing to follow procedures, customs, and/or protocols designed to assess and determine what medications inmates such as Mrs. Redclift should be prescribed and receive while incarcerated at the Schuylkill County Prison;

c.  Failing to follow procedures, customs, and/or protocols designed to ensure that inmates such as Mrs. Redclift received the necessary and appropriate medication in the correct dosages and in a timely manner;

40

d.  Failing to accurately, appropriately, and timely assess and determine the medications that Mrs. Redclift was prescribed as of the time she was incarcerated, including but not limited to Paxil;

e.  Failing to accurately, appropriately, and timely assess and determine what medications, including but not limited to Paxil, that Mrs. Redclift should be prescribed and receive while incarcerated at the Schuylkill County Prison, given her condition and medical history, including but not limited to her mental health history;

f.  Failing to ensure that Mrs. Redclift received the necessary and appropriate medication, including but not limited to Paxil, in the correct dosages and in a timely manner;

g.  Failing to timely realize that Mrs. Redclift was not receiving Paxil as prescribed or as was necessary under the circumstances;

h.  Failing to timely advise nursing and prison personnel that Mrs. Redclift had not been prescribed Paxil, and had not received the same;

i.  Failing to recommend to nurses and prison personnel at the Schuylkill County Prison that Mrs. Redclift be kept on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

j.  Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

k.  Failing to ensure that Mrs. Redclift was not placed in a cell with implements, such as shoe laces, with which she could hang herself, after realizing she had missed multiple doses of Paxil;

l.  Failing to ensure that Mrs. Redclift was restrained in her cell in a manner that would have prevented her from hanging herself, after realizing she had missed multiple doses of Paxil;

m.  Failing to ensure that Mrs. Redclift was placed in a cell where she could not hang herself, after realizing she had missed multiple doses of Paxil;

n.  Failing to recommend that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

o.  Failing to ensure that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

p.   Failing to follow procedures, customs, and/or protocols on how to appropriately respond when an inmate misses one or more doses of a psychotropic medication;

q.   Failing to follow procedures, customs, and/or protocols designed to assess and determine what precautions should be taken when an inmate misses one or more doses of a psychotropic medication;

r.   Failing to do any of the acts alleged in Paragraph 80, above;

s.   Failing to follow established policies, procedures, practices, and customs designed to achieve any of the objectives in any of the above subparagraphs;

129.   Based on the above, it is believed and therefore averred that NP Macaluso acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide by:

a.   Failing to follow procedures, customs, and/or protocols designed to assess and determine the medications that inmates such as Mrs. Redclift were prescribed prior to being incarcerated;

b.   Failing to follow procedures, customs, and/or protocols designed to assess and determine what medications inmates such as Mrs. Redclift should be prescribed and receive while incarcerated at the Schuylkill County Prison;

c.   Failing to follow procedures, customs, and/or protocols designed to ensure that inmates such as Mrs. Redclift received the necessary and appropriate medication in the correct dosages and in a timely manner;

d.   Failing to accurately, appropriately, and timely assess and determine the medications that Mrs. Redclift was prescribed as of the time she was incarcerated, including but not limited to Paxil;

e.   Failing to accurately, appropriately, and timely assess and determine what medications, including but not limited to Paxil, that Mrs. Redclift should be prescribed and receive while incarcerated at the Schuylkill County Prison, given her condition and medical history, including but not limited to her mental health history;

f.   Failing to ensure that Mrs. Redclift received the necessary and appropriate medication, including but not limited to Paxil, in the correct dosages and in a timely manner;

g.   Failing to timely realize that Mrs. Redclift was not receiving Paxil as prescribed or as was necessary under the circumstances;

h.   Failing to timely advise nursing and prison personnel that Mrs. Redclift had not been prescribed Paxil, and had not received the same;

i.   Failing to recommend to nurses and prison personnel at the Schuylkill County Prison that Mrs. Redclift be kept on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

j.   Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

k.   Failing to ensure that Mrs. Redclift was not placed in a cell with implements, such as shoe laces, with which she could hang herself, after realizing she had missed multiple doses of Paxil;

l.   Failing to ensure that Mrs. Redclift was restrained in her cell in a manner that would have prevented her from hanging herself, after realizing she had missed multiple doses of Paxil;

m.   Failing to ensure that Mrs. Redclift was placed in a cell where she could not hang herself, after realizing she had missed multiple doses of Paxil;

n.   Failing to recommend that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

o.   Failing to ensure that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

p.   Failing to follow procedures, customs, and/or protocols on how to appropriately respond when an inmate misses one or more doses of a psychotropic medication;

q.   Failing to follow procedures, customs, and/or protocols designed to assess and determine what precautions should be taken when an inmate misses one or more doses of a psychotropic medication;

r.   Failing to do any of the acts alleged in Paragraph 80, above;

s.   Failing to follow established policies, procedures, practices, and customs designed to achieve any of the objectives in any of the above subparagraphs;

130.    Based on the above, it is believed and therefore averred that NP McGowan acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide by:

a.  Failing to follow procedures, customs, and/or protocols designed to assess and determine the medications that inmates such as Mrs. Redclift were prescribed prior to being incarcerated;

b.  Failing to follow procedures, customs, and/or protocols designed to assess and determine what medications inmates such as Mrs. Redclift should be prescribed and receive while incarcerated at the Schuylkill County Prison;

c.  Failing to follow procedures, customs, and/or protocols designed to ensure that inmates such as Mrs. Redclift received the necessary and appropriate medication in the correct dosages and in a timely manner;

d.  Failing to accurately, appropriately, and timely assess and determine the medications that Mrs. Redclift was prescribed as of the time she was incarcerated, including but not limited to Paxil;

e.  Failing to accurately, appropriately, and timely assess and determine what medications, including but not limited to Paxil, that Mrs. Redclift should be prescribed and receive while incarcerated at the Schuylkill County Prison, given her condition and medical history, including but not limited to her mental health history;

f.  Failing to ensure that Mrs. Redclift received the necessary and appropriate medication, including but not limited to Paxil, in the correct dosages and in a timely manner;

g.  Failing to timely realize that Mrs. Redclift was not receiving Paxil as prescribed or as was necessary under the circumstances;

h.  Failing to timely advise nursing and prison personnel that Mrs. Redclift had not been prescribed Paxil, and had not received the same;

i.  Failing to recommend to nurses and prison personnel at the Schuylkill County Prison that Mrs. Redclift be kept on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

j.  Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

k.  Failing to ensure that Mrs. Redclift was not placed in a cell with implements, such as shoe laces, with which she could hang herself, after realizing she had missed multiple doses of Paxil;

l.  Failing to ensure that Mrs. Redclift was restrained in her cell in a manner that would have prevented her from hanging herself, after realizing she had missed multiple doses of Paxil;

m.  Failing to ensure that Mrs. Redclift was placed in a cell where she could not hang herself, after realizing she had missed multiple doses of Paxil;

n.  Failing to recommend that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

o.  Failing to ensure that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

p.  Failing to follow procedures, customs, and/or protocols on how to appropriately respond when an inmate misses one or more doses of a psychotropic medication;

q.  Failing to follow procedures, customs, and/or protocols designed to assess and determine what precautions should be taken when an inmate misses one or more doses of a psychotropic medication;

r.  Failing to do any of the acts alleged in Paragraph 80, above;

s.  Failing to follow established policies, procedures, practices, and customs designed to achieve any of the objectives in any of the above subparagraphs;

131.  Based on the above, it is believed and therefore averred that Nurse Gross acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide by:

a.  Failing to follow procedures, customs, and/or protocols related to the administration of medication to inmates;

b.  Failing to follow procedures, customs, and/or protocols on how to appropriately respond when an inmate misses one or more doses of a psychotropic medication;

c.  Failing to follow procedures, customs, and/or protocols on appropriately responding to an inmate that refuses to take medication;

d.  Failing to follow procedures, customs, and/or protocols designed to assess and determine what precautions should be taken when an inmate misses one or more doses of a psychotropic medication;

e.  Failing to follow procedures, customs, and/or protocols designed to ensure that inmates such as Mrs. Redclift received the necessary and appropriate medication in the correct dosages and in a timely manner;

f.  Failing to ensure that Mrs. Redclift received the necessary and appropriate medication, including but not limited to Paxil, in the correct dosages and in a timely manner;

g.  Failing to recommend to nurses and prison personnel at the Schuylkill County Prison that Mrs. Redclift be kept on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

h.  Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide, after realizing she had missed multiple doses of Paxil;

i.  Failing to ensure that Mrs. Redclift was not placed in a cell with implements, such as shoe laces, with which she could hang herself, after realizing she had missed multiple doses of Paxil;

j.  Failing to ensure that Mrs. Redclift was restrained in her cell in a manner that would have prevented her from hanging herself, after realizing she had missed multiple doses of Paxil;

k.  Failing to ensure that Mrs. Redclift was placed in a cell where she could not hang herself, after realizing she had missed multiple doses of Paxil;

l.  Failing to recommend that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

m.  Failing to ensure that there be a reassessment of Mrs. Redclift's mental health and suicide risks after realizing she had missed multiple doses of Paxil;

n.  Failing to do any of the acts alleged in Paragraph 80, above;

o.  Failing to follow established policies, procedures, practices, and customs designed to achieve any of the objectives in any of the above subparagraphs;

132.    Based on the above, it is believed and therefore averred that all Defendants named in this Count, that is, Nurse Hollywood, the Medical Staff Defendants acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide in the following ways:

    a.  Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to check Mrs. Redclift's prison chart and ensure that all appropriate measures were being taken in furtherance of Mrs. Redclift's health and well-being;

    b.  Failing to timely and accurately check Mrs. Redclift's prison chart and realize that she was a risk for self-harm and/or suicide;

    c.  Failing to timely and accurately examine Mrs. Redclift and realize that she was a risk for self-harm and/or suicide;

    d.  Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to routinely check on Mrs. Redclift's health, wellness, and mental status;

    e.  Failing to timely and accurately check Mrs. Redclift's prison chart and realize that she was not prescribed a psychotropic drug, Paxil, that was necessary for mental health;

    f.  Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risk of self-harm or suicide when they knew or should have known that Mrs. Redclift had refused to take all medication prescribed to her in the prison;

    g.  Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risk of self-harm or suicide when they knew or should have known Mrs. Redclift was informed that her husband and son no longer wanted to speak with her;

    h.  Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risk of self-harm or suicide when they knew or should have known that such a risk was present and likely to be occur;

    i.  Failing to timely and accurately recognize Mrs. Redclift was at a risk for self-harm and/or suicide, when the risk of the same was present and obvious;

    j.  Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to reassess or further assess Mrs. Reclift's health, wellness, mental status, and suicide risk factors, at a time when the need for reassessment should have been obvious;

k.  Failing to timely and accurately conduct a thorough, complete, and accurate reassessment of Mrs. Redclift's health, wellness, mental status, and suicide risk factors, at a time when relevant factors effecting her conditions had changed;

l.  Failing to monitor, observe, round on, or otherwise check on Mrs. Redclift to see if her mental condition, self-harm risk factors, or suicide risk factors had changed;

m.  Failing to timely and adequately alter their course of care for Mrs. Redclift after it became obvious that factors affecting her condition had changed and after it became obvious that she was not receiving the requisite care that was appropriate for her;

n.  Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to document and communicate with each other, PrimeCare personnel, and prison personnel relative to Mrs. Redclift's mental health and suicide risk factors, and relative to their physical observations of Mrs. Redclift;

o.  Failing to recommend to nurses and prison personnel at the Schuylkill County Prison that Mrs. Redclift be kept on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide;

p.  Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened observations or monitoring protocols designed to prevent the risk of self-harm and/or suicide;

q.  Failing to ensure that Mrs. Redclift was not placed in a cell with implements, such as shoe laces, with which she could hang herself;

r.  Failing to ensure that Mrs. Redclift was restrained in her cell in a manner that would have prevented her from hanging herself (in other words, failing to place her in a suicide-proof or high-risk cell);

s.  Failing to ensure that Mrs. Redclift was provided access to a psychiatrist, psychologist, or therapist prior to being placed into the general prison population;

t.  Failing to ensure that Mrs. Redclift was provided access to a psychiatrist, psychologist, or therapist at a time when they knew she had requested one, and at a time when they knew that was needed;

u.  Failing to do any of the acts alleged in Paragraph 80, above;

v.  Failing to follow established policies, procedures, practices, and customs designed to achieve any of the objectives in any of the above subparagraphs;

133.    Mrs. Redclift had the right to be secure in her life and person and to receive proper medical care and attention while detained/confined under state authority.

134.    Pursuant to the Fourteenth Amendment to the United States Constitution, Mrs. Redclift had the right to be free from cruel and unusual punishment and to receive proper medical care and attention while detained/confined under state authority.

135.    As a direct and proximate result of Defendants' deliberate indifference to Mrs. Redclift's constitutional rights, as set forth herein, she was provided with the opportunity to commit self-harm within the Schuylkill County Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death from hanging.

136.    The actions of all named Defendants manifested a deliberate indifference to Mrs. Redclift's constitutional rights in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

## COUNT IV

### PLAINTIFF VS. PRIMECARE

### DELIBERATE INDIFFERENCE TO CIVIL RIGHTS
### PURSUANT TO 42 U.S.C. §1983
### CUSTOM, PATTERN, PRACTICE,  POLICY, TRAINING

137.    Paragraphs 1 through 136, above, are incorporated by reference.

138.    Defendant, PrimeCare, was at all times contracted with the County and/or the Prison Board to provide comprehensive medical services to the Schuylkill County Prison.

139.     It is believed and therefore averred that at all relevant times PrimeCare operated under the color of state law, and that as such they are liable under Section 1983.

140.     It is believed and therefore averred that PrimeCare's responsibilities within the Schuylkill County Prison included, but was not limited to: (i) staffing and training of prison nurses and other medical personnel in the prison; (ii) formulation and enforcement of policy/procedures regarding medical issues, including mental health issues and suicide risks of inmates; (iii) the performance of daily inmate assessment and evaluations; (iv) the diagnosing, treatment, and prevention of medical illness, including mental illness, among the prison population; (v) the prevention of self-harm and suicide attempts by the prison population; and (vi) ensuring the overall health, safety and well-being of the prison population.

141.     Defendant, PrimeCare, was responsible for training its employees, agents, ostensible agents, and contractors on the appropriate ways to best ensure compliance with the aforementioned policies, procedures, practices, and customs so that it could ensure the health, safety and well-being of the Schuylkill County inmate population.

142.     Defendant, PrimeCare, was responsible for training its employees, agents, ostensible agents, and contractors on the appropriate ways to diagnose, manage, and treat inmates with mental illness, self-harm risk factors, and suicide risk factors.

143.     Defendant, PrimeCare, through its relevant decision and policy makers, knew and/or should have known that inmates with a history of mental health issues and treatment, with a history of suicide attempts, and who were presently treating for mental health issues should be considered a high-risk, suicidal inmate while incarcerated.

144.     Defendant, PrimeCare, through its relevant decision and policy makers, knew and/or should have known that an inmate with a history of mental health issues and treatment, with

a history of suicide attempts, and who was presently treating for mental health issues would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated, was susceptible to attempting and/or committing suicide, and would likely attempt to harm themselves or to attempt suicide.

145.    It is believed and therefore averred that based upon the Defendant's institutional knowledge and the training, education, knowledge, and experience of their decision and policy makers, PrimeCare knew and/or should have known that failing to create, establish, implement, and enforce appropriate policies, procedures, practices, and customs designed to ensure the health, safety and well-being of inmates placed under their care, and that failing to train their employees, agents, ostensible agents, and contractors thereon, would jeopardize the health, safety and welfare of their /inmates and would lead to self-harm and suicide in some circumstances.

146.    Despite the foregoing, Defendant, PrimeCare, was deliberately indifferent to the medical needs and constitutional rights of inmates, like Mrs. Redclift, and otherwise failed to ensure the health, safety, and welfare of inmates like Mrs. Redclift in the following ways:

a.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to ensure the health, safety and well-being of inmates under its care, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

b.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to timely and accurately assess and identify inmates with mental illness and suicide risk, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

c.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to periodically check inmates' prison charts to ensure that all appropriate measures were being taken in furtherance of their health and well-being, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

d.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to ensure that all required medicines were being administered to the inmates, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

e.  Failing to train its employees, agents, ostensible agents, or contractors on how to timely, thoroughly, appropriately and accurately evaluate and assess an inmate's mental status and risk for self-harm and/or suicide;

f.  Failing to train its employees, agents, ostensible agents, or contractors on how to timely, thoroughly, appropriately and accurately identify, appreciate, and evaluate an inmate's risk factors for self-harm and suicide;

g.  Failing to implement a proper assessment tool for accurately identifying inmates who are at risk of self-harm and/or suicide.

h.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs dictating how to safely and appropriately treat, manage, and care for an inmate who manifests risk factors for self-harm and suicide;

i.  Failing to train their employees, agents, ostensible agents, or contractors on how to safely and appropriately treat, manage, and care for an inmate who manifests risk factors for self-harm and suicide;

j.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to ensure that the Schuylkill County Prison and its employees, agents, ostensible agents, or contractors were made aware of and understood an inmate's mental illnesses and/or suicide risks, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

k.  Failing to train its employees, agents, ostensible agents, or contractors to accurately and timely communicate and document all relevant mental health, self-harm risk factors, and suicide risk factors to the prison and its employees, agents, ostensible agents and contractors;

l.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate be placed on suicide watch when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

m. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate be housed in a suicide-proof cell when the risk of

self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

n. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate not be given access to implements, like shoe laces, that are commonly used to commit suicide, when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

o. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate was not unrestrained in a regular cell when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

p. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to conduct periodic follow-up evaluations or assessments of inmates who present with mental illness or have self-harm or suicide risk factors, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

q. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to conduct a reassessment of an inmate's mental health, self-harm risk factors, and suicide risk factors after circumstances relevant to those factors have changed, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

r. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to conduct a reassessment of an inmate's mental health, self-harm risk factors, and suicide risk factors after discovering that the inmates had not been receiving prescribed, mental-health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

s. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to alter/improve the course of treatment when an inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

t.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to implement extra precautions in caring for and treating and inmate when that inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

u.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to move an inmate to a suicide-proof room, and/or ensure that the inmate is not in possession of implements that could inflict self-harm/suicide, and/or provide extra supervision and monitoring to an inmate when that inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

v.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors ensure that an inmate sees a mental health professional in a timely manner when the inmate requests the same, or when the need for the same is clear, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon.

w.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to achieve the objectives articulated in Paragraphs 80, 81, and the subparagraphs of Paragraph 132, above;

147.    Based on the above, it is believed and therefore averred that Defendant, PrimeCare, acted with deliberate indifference to Mrs. Redclift's constitutional rights by having a known custom, pattern, practice, and/or policy of inadequate assessment, evaluation, observation and supervision of inmates in its care, custody and control, including those who are suffer with mental health difficulties such as Mrs. Redclift.

148.    Based on the above, it is believed and therefore averred that Defendant, PrimeCare, acted with deliberate indifference to Mrs. Redclift's constitutional rights by having a known custom, pattern, practice, and/or policy of permitting inadequate evaluation, training, and supervision of its employees, agents, ostensible agents, and/or contractors.   Specifically,

Defendants' supervisory or administrative staff had a custom, pattern, practice, and/or policy of failing to ensure its nurses and nurse practitioners provided adequate and thorough monitoring, observation, evaluation, and assessment of inmates like Mrs. Redclift, who suffered with mental health disorders and exhibited self-harm and suicide risks.

149.    It is believed and therefore averred that the aforementioned lack of proper supervision, monitoring, evaluation, and assessment of inmates was so wide spread and pervasive that it developed into a customary practice, of which Defendants was aware of and condoned.

150.    Mrs. Redclift had the right to be secure in her life and person and to receive proper medical care and attention while detained/confined under state authority.

151.    Pursuant to the Fourteenth Amendment to the United States Constitution, Mrs. Redclift had the right to be free from cruel and unusual punishment and to receive proper medical care and attention while detained/confined under state authority

152.    The Defendant, PrimeCare, violated her rights through the aforementioned conduct.

153.    The violations of Mrs. Redclift's constitutional rights as set forth within, were a highly predictable, and even expected, consequence of the failures to train PrimeCares employees, agents, ostensible agents, and/or contractors.

154.    As a direct and proximate result of Defendants' deliberate indifference to Ms. Redclift's constitutional rights, as set forth herein, Ms. Redclift was provided with the opportunity to commit self-harm and suicide while incarcerated within the Schuylkill County Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death from hanging.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty

Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

### COUNT V

### PLAINTIFF V. WARDEN BERDANIER, LT. LINE, CO GARCIA, CO SELGRADE, CO GOTSHALL, LT HOBAN, CO RAUENZAUHN, CO BERGAN, CO CONFER, CO FERTIG, CO BENDER, CO MOYER, CO SCHWEIKERT, CO PARKER, LT. KEPPEL AND MS. GILBERT

### DELIBERATE INDIFFERENCE TO MRS. REDCLIFT'S SERIOUS MEDICAL NEEDS AND TO HER KNOWN RISK OF SUICIDE PURSUANT TO THE FOURTEENTH AMENDMENT AND 42 U.S.C. §1983

155.     Paragraphs 1 through 154, above, are fully incorporated by reference.

156.     At all relevant times, the Defendants, Warden Berdanier, Lt. Line, CO Garcia, CO Selgrade, CO Gotshall, Lt. Hoban, CO Rauenzahn, CO Bergan, CO Confer, CO Fertig, CO Bender, CO Moyer, CO Schwiegert, CO Parker, Lt. Keppel, and Ms. Gilbert, were worked at the Schuylkill County Prison and were either the employees, agents, ostensible agents, or contractors of either the County or the Prison Board. For ease of reference, these individuals will be referred to collectively as the "Prison Defendants."

157.     At all relevant times, the Prison Defendants acted under color of state law.

158.     At all relevant times, in their capacity as employees, agents, ostensible agents, and/or contractors of the County or the Prison Board who were working at the Schuylkill County Prison, the Prison Defendants had the responsibility of, *inter alia,* ensuring the overall health, safety and well-being of the prison population.

159.     The responsibility of ensuring the overall health, safety and well-being of the prison population included, but was not limited to: (i) making sure that the inmate population was receiving the proper, appropriate, and necessary medical attention and treatment; (ii) making sure

that the inmate population was receiving the proper, appropriate, and necessary medication; (iii) making sure that the inmate population was properly observed and monitored; (iv) making sure that members of the inmate population who were particular vulnerable to self-harm and suicide were not placed in situations where they could harm themselves; (v) making sure that the inmate population was appropriately classified based on, *inter alia*, their self0harm and suicide risks; (vi) making sure that members of the inmate population were appropriately housed in the prison based on, *inter alia*, their risk of self-harm and/or suicide; and (vii) making sure that members of the inmate population did not attempt or commit suicide.

160.    It is believed and therefore averred that the Prison Defendants were working at the Schuylkill County Prison at the time of Mrs. Redclift's incarceration.

161.    Warden Berdanier and Ms. Gilbert, along with the County and the Prison Board, had the added responsibility of creating, establishing, and enforcing policies, procedures, practices, and customs that would promote and maintain the overall health, safety, and well-being of the prison population.

162.    All Prison Defendants had the responsibility of complying with the policies, procedures, practices, and customs implemented in the Schuylkill County Prison.

163.    It is believed and therefore averred that at all relevant times, the Prison Defendants knew and/or should have known that Mrs. Redclift had a history of mental illness, psychotic episodes, suicide attempts/tendencies, and psychiatric hospitalizations prior to the time she was incarcerated at the Schuylkill County Prison, and that she was currently treating for mental illness and was on medication for the same.

164.    It is believed and therefore averred that at all relevant times, the Prison Defendants knew and/or should have known that an arrestee/detainee/inmate in Mrs. Redclift's present mental

state and with her history of mental health issues and treatment should be considered a high-risk, suicidal inmate while incarcerated.

165.    It is believed and therefore averred that at all relevant times, the Prison Defendants knew and/or should have known that an arrestee/detainee/inmate in Mrs. Redclift's state and with her history of mental health issues and treatment would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated, was susceptible to attempting and/or committing suicide, and would likely attempt to harm themselves or to attempt suicide.

166.    It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior history of mental illness and suicide attempts, the Prison Defendants knew and/or should have known that: (i) Mrs. Redclift would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated; (ii) she was susceptible to attempting and/or committing suicide; and (iii) that she would likely attempt to harm herself or to attempt suicide.

167.    It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior history of mental illness and suicide attempts, the Prison Defendants knew and/or should have known that a thorough, proper, and timely evaluation of Mrs. Redclift's risk of self-harm and suicide was necessary to guard against and prevent the possibility that Mrs. Redclift would attempt to harm herself or commit suicide.

168.    It is believed and therefore averred that based on their training, education, knowledge, and experiences, and in light of Mrs. Redclift's present mental state and her prior history of mental illness and suicide attempts, the Prison Defendants knew and/or should have known that implementing the appropriate precautions indicated by the self-harm/suicide

evaluation was necessary to guard against and prevent the possibility that Mrs. Redclift would attempt to harm herself or commit suicide.

169.    Based on the above, it is believed and therefore averred that Warden Berdanier and Ms. Gilbert:

   a.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to timely and accurately assess and identify inmates with mental illness and suicide risk, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

   b.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to timely and accurately assess and identify inmates with mental illness and suicide risk, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

   c.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to periodically check inmates' prison charts to ensure that all appropriate measures were being taken in furtherance of their health and well-being, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

   d.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to ensure that all required medicines were being administered to the inmates, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

   e.   Failing to train its employees, agents, ostensible agents, or contractors on how to timely, thoroughly, appropriately and accurately evaluate and assess an inmate's mental status and risk for self-harm and/or suicide;

   f.   Failing to train its employees, agents, ostensible agents, or contractors on how to timely, thoroughly, appropriately and accurately identify, appreciate, and evaluate an inmate's risk factors for self-harm and suicide;

   g.   Failing to create, establish, implement, and enforce policies, procedures, practices, and customs dictating how to safely and appropriately treat, manage, and care for an inmate who manifests risk factors for self-harm and suicide;

   h.   Failing to train their employees, agents, ostensible agents, or contractors on how to safely and appropriately treat, manage, and care for an inmate who manifests risk factors for self-harm and suicide;

i.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to ensure that the Schuylkill County Prison and its employees, agents, ostensible agents, or contractors were made aware of and understood an inmate's mental illnesses and/or suicide risks, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

j.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate be placed on suicide watch when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

k.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate be housed in a suicide-proof cell when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

l.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate not be given access to implements, like shoe laces, that are commonly used to commit suicide, when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

m.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate was not unrestrained in a regular cell when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

n.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to conduct periodic rounds or inspections of inmates cells, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

o.  Failing to train their employees, agents, ostensible agents, or contractors on how to properly conduct periodic rounds and inspect inmates and their cells for evidence that the inmate may be planning an act of self-harm or suicide.

p.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to demand and ensure that a reassessment of an inmate's mental health, self-harm risk

factors, and suicide risk factors be completed after circumstances relevant to those factors have changed, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

q. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to demand and ensure that a reassessment of an inmate's mental health, self-harm risk factors, and suicide risk factors is completed after discovering that the inmates had not been receiving prescribed, mental-health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

r. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to increase the level/intensity of inmate monitoring/observation when an inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

s. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to implement extra precautions in caring for and managing an inmate when that inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

t. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to move an inmate to a suicide-proof room, and/or ensure that the inmate is not in possession of implements that could inflict self-harm/suicide, and/or provide extra supervision and monitoring to an inmate when that inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

u. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors ensure that an inmate sees a mental health professional in a timely manner when the inmate requests the same, or when the need for the same is clear, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon.

v.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to achieve the objective articulated in Paragraphs 80 and 81, above, or the subparagraphs of Paragraph 170, below.

170.  Based on the above, it is believed and therefore averred that all the Prison Defendants acted with deliberate indifference towards Mrs. Redclift's serious medical needs and her known risk of suicide by:

a.  Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to check Mrs. Redclift's prison chart and ensure that all appropriate measures were being taken in furtherance of Mrs. Redclift's health and well-being;

b.  Failing to be aware of the risk factors associated with self-harm and suicide;

c.  Failing to timely and accurately realize that Mrs. Redclift demonstrated risk factors associated with self-harm and suicide and that she was at a heightened risk of self-harm and/or suicide;

d.  Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risks of self-harm and suicide, when those risks were obvious and should have been known;

e.  Failing to timely and accurately check Mrs. Redclift's prison chart and realize that she was a risk for self-harm and/or suicide;

f.  Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to routinely check on, monitor, inspect, round on, or otherwise observe Mrs. Redclift's health, wellness, and mental status, and to document or report the results thereof;

g.  Failing to timely accurately document Mrs. Redclift's mental health and self-harm/suicide factors throughout her incarceration;

h.  Failing to timely and accurately check Mrs. Redclift's prison chart and realize that she was not prescribed a psychotropic drug, Paxil, that was necessary for mental health;

i.  Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risk of self-harm or suicide when they knew or should have known that she was not prescribed or administered Paxil, a medication needed for her mental health;

j.   Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risk of self-harm or suicide when they knew or should have known that Mrs. Redclift had refused to take all medication prescribed to her in the prison;

k.   Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risk of self-harm or suicide when they knew or should have known Mrs. Redclift was informed that her husband and son no longer wanted to speak with her;

l.   Failing to timely monitor, observe, round on, or otherwise check on Mrs. Redclift to see if her mental condition or her self-harm or suicide risk factors had changed;

m.   Failing to take timely and appropriate steps to protect and guard against Mrs. Redclift's risk of self-harm or suicide when they knew or should have known that such a risk was present and likely to be occur;

n.   Failing to timely and accurately recognize Mrs. Redclift was at a risk for self-harm and/or suicide, when the risk of the same was present and obvious;

o.   Failing to timely and accurately request that a thorough, complete, and accurate reassessment of Mrs. Redclift's health, wellness, mental status, and suicide risk factors, at a time when relevant factors effecting her conditions had changed;

p.   Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to document and communicate with each other, PrimeCare personnel, and prison personnel relative to Mrs. Redclift's mental health and suicide risk factors, and relative to their physical observations of Mrs. Redclift;

q.   Failing to recommend that Mrs. Redclift be placed on suicide watch or be subjected to other, heightened monitoring to prevent the risk of self-harm and/or suicide;

r.   Failing to ensure that Mrs. Redclift was placed on suicide watch or subjected to other, heightened observations or monitoring protocols designed to prevent the risk of self-harm and/or suicide;

s.   Failing to ensure that Mrs. Redclift was not placed in a cell with implements, such as shoe laces, with which she could hang herself;

t.   Failing to ensure that Mrs. Redclift was restrained in her cell in a manner that would have prevented her from hanging herself

u.   Failing to ensure that Mrs. Redclift was placed in a suicide-proof cell;

v.   Failing to ensure that Mrs. Redclift was provided access to a psychiatrist, psychologist, or therapist prior to being placed into the general prison population;

w.  Failing to ensure that Mrs. Redclift was provided access to a psychiatrist, psychologist, or therapist at a time when they knew she had requested one, and at a time when they knew that was needed;

x.  Failing to do any act described in Paragraph 80, above;

y.  Failing to follow any of the established policies, procedures, practices, and customs designed to achieve the objectives articulated in Paragraphs 80, 81, and the subparagraphs of this Paragraph,

171.   Mrs. Redclift had the right to be secure in her life and person and to receive proper medical care and attention while detained/confined under state authority.

172.   Pursuant to the Fourteenth Amendment to the United States Constitution, Mrs. Redclift had the right to be free from cruel and unusual punishment and to receive proper medical care and attention while detained/confined under state authority.

173.   As a direct and proximate result of Defendants' deliberate indifference to Mrs. Redclift's constitutional rights, as set forth herein, she was provided with the opportunity to commit self-harm within the Schuylkill County Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death from hanging.

174.   The actions of all named Defendants manifested a deliberate indifference to Mrs. Redclift's constitutional rights in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

<u>**COUNT VI**</u>

**PLAINTIFF VS. THE COUNTY AND PRISON BOARD**

<u>**DELIBERATE INDIFFERENCE TO CIVIL RIGHTS**</u>
<u>**PURSUANT TO 42 U.S.C. §1983**</u>
<u>**CUSTOM, PATTERN, PRACTICE, POLICY, TRAINING**</u>

175.    Paragraphs 1 through 174, above, are incorporated by reference.

176.    Defendants, the County and the Prison Board, at all relevant times had the responsibility of, *inter alia*, operating the Schuylkill County Prison.

177.    The responsibilities of the County and Prison Board included the responsibility of maintaining the health, safety, and welfare of everyone inside the Schuylkill County Prison, including inmates.

178.    The County and the Prison Board also had the responsibility of creating, establishing, implementing, and enforcing policies that would further the above objective.

179.    The County and the Prison Board and the added responsibility of training its employees, agents, ostensible agents, and contractors on the appropriate ways to best ensure compliance with the aforementioned policies, procedures, practices, and customs so that it could ensure the health, safety and well-being of those inside the Schuylkill County Prison.

180.    Defendants, the County and the Prison Board, through its relevant decision and policy makers, knew and/or should have known that inmates with a history of mental health issues and treatment, with a history of suicide attempts, and who were presently treating for mental health issues should be considered a high-risk, suicidal inmate while incarcerated.

181.    Defendants, the County and the Prison Board, through its relevant decision and policy makers, knew and/or should have known that an inmate with a history of mental health issues and treatment, with a history of suicide attempts, and who was presently treating for mental

health issues would be especially vulnerable to the mental hardship endured while in custody and/or incarcerated, was susceptible to attempting and/or committing suicide, and would likely attempt to harm themselves or to attempt suicide.

182.    It is believed and therefore averred that based upon the Defendant's institutional knowledge and the training, education, knowledge, and experience of their decision and policy makers, Defendants, the County and the Prison Board, knew and/or should have known that failing to create, establish, implement, and enforce appropriate policies, procedures, practices, and customs designed to ensure the health, safety and well-being of inmates placed under their care, and that failing to train their employees, agents, ostensible agents, and contractors thereon, would jeopardize the health, safety and welfare of their /inmates and would lead to self-harm and suicide in some circumstances.

183.    Despite the foregoing, Defendants, the County and the Prison Board, were deliberately indifferent to the medical needs and constitutional rights of inmates, like Mrs. Redclift, and otherwise failed to ensure the health, safety, and welfare of inmates like Mrs. Redclift in the following ways:

      a.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to timely and accurately assess and identify inmates with mental illness and suicide risk, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

      b.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to timely and accurately assess and identify inmates with mental illness and suicide risk, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

      c.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to periodically check inmates' prison charts to ensure that all appropriate measures were being taken in furtherance of their health and well-being, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

d.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to ensure that all required medicines were being administered to the inmates, and/or in the alternative, failing to properly and adequately train its employees, agents, ostensible agents, or contractors thereon;

e.  Failing to train its employees, agents, ostensible agents, or contractors on how to timely, thoroughly, appropriately and accurately evaluate and assess an inmate's mental status and risk for self-harm and/or suicide;

f.  Failing to train its employees, agents, ostensible agents, or contractors on how to timely, thoroughly, appropriately and accurately identify, appreciate, and evaluate an inmate's risk factors for self-harm and suicide;

g.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs dictating how to safely and appropriately treat, manage, and care for an inmate who manifests risk factors for self-harm and suicide;

h.  Failing to train their employees, agents, ostensible agents, or contractors on how to safely and appropriately treat, manage, and care for an inmate who manifests risk factors for self-harm and suicide;

i.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to ensure that the Schuylkill County Prison and its employees, agents, ostensible agents, or contractors were made aware of and understood an inmate's mental illnesses and/or suicide risks, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

j.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate be placed on suicide watch when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

k.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate be housed in a suicide-proof cell when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

l.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate not be given access to implements, like shoe laces,

that are commonly used to commit suicide, when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

m. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to insist and ensure that an inmate was not unrestrained in a regular cell when the risk of self-harm or suicide is obvious, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

n. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to conduct periodic rounds or inspections of inmates cells, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

o. Failing to train their employees, agents, ostensible agents, or contractors on how to properly conduct periodic rounds and inspect inmates and their cells for evidence that the inmate may be planning an act of self-harm or suicide.

p. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to demand and ensure that a reassessment of an inmate's mental health, self-harm risk factors, and suicide risk factors be completed after circumstances relevant to those factors have changed, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

q. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to demand and ensure that a reassessment of an inmate's mental health, self-harm risk factors, and suicide risk factors is completed after discovering that the inmates had not been receiving prescribed, mental-health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

r. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to increase the level/intensity of inmate monitoring/observation when an inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

s. Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to implement extra precautions in caring for and managing an inmate when that

inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

t.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors to move an inmate to a suicide-proof room, and/or ensure that the inmate is not in possession of implements that could inflict self-harm/suicide, and/or provide extra supervision and monitoring to an inmate when that inmate experiences a change in self-harm/suicide risk factors or when the inmate is not given prescribed mental health medication, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon;

u.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs requiring its employees, agents, ostensible agents, or contractors ensure that an inmate sees a mental health professional in a timely manner when the inmate requests the same, or when the need for the same is clear, and/or, in the alternative, failing to properly and adequately train their employees, agents, ostensible agents, or contractors thereon.

w.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to achieve the objectives articulated in the subparagraphs of this Paragraph;

x.  Failing to create, establish, implement, and enforce policies, procedures, practices, and customs designed to achieve the objectives articulated in Paragraphs 80 and 81, above, or the subparagraphs of Paragraph 170, above.

184.  Based on the above, it is believed and therefore averred that Defendants, the County and the Prison Board, acted with deliberate indifference to Mrs. Redclift's constitutional rights by having a known custom, pattern, practice, and/or policy of inadequate assessment, evaluation, observation and supervision of inmates in its care, custody and control, including those who are suffer with mental health difficulties such as Mrs. Redclift.

185.  Based on the above, it is believed and therefore averred that Defendants, the County and the Prison Board, acted with deliberate indifference to Mrs. Redclift's constitutional rights by having a known custom, pattern, practice, and/or policy of permitting inadequate evaluation, training, and supervision of its employees, agents, ostensible agents, and/or contractors.

Specifically, Defendants' supervisory or administrative staff had a custom, pattern, practice, and/or policy of failing to ensure its nurses and nurse practitioners provided adequate and thorough monitoring, observation, evaluation, and assessment of inmates like Mrs. Redclift, who suffered with mental health disorders and exhibited self-harm and suicide risks.

186.    It is believed and therefore averred that the aforementioned lack of proper supervision, monitoring, evaluation, and assessment of inmates was so wide spread and pervasive that it developed into a customary practice, of which Defendants was aware of and condoned.

187.    Mrs. Redclift had the right to be secure in her life and person and to receive proper medical care and attention while detained/confined under state authority.

188.    Pursuant to the Fourteenth Amendment to the United States Constitution, Mrs. Redclift had the right to be free from cruel and unusual punishment and to receive proper medical care and attention while detained/confined under state authority

189.    The Defendants, the County and Prison Board, violated her rights through the aforementioned conduct.

190.    The violations of Mrs. Redclift's constitutional rights as set forth within, were a highly predictable, and even expected, consequence of the failures to train the employees, agents, ostensible agents, and/or contractors of the County and/or the Prison Board.

191.    As a direct and proximate result of Defendants' deliberate indifference to Ms. Redclift's constitutional rights, as set forth herein, Ms. Redclift was provided with the opportunity to commit self-harm and suicide while incarcerated within the Schuylkill County Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death from hanging.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty

Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

## COUNT VII

**PLAINTIFF V. DEFENDANTS PRIMECARE MEDICAL, INC., NICOLE HOLLWOOD, LPN, ALYSSA HYSOCK, LPN, CAYLA SULLIVAN, LPN, TARA HAMM, LPN, PAULA DILLMAN-MCGOWAN, CRNP, NICOLE MACALUSO, CRNP, CATHERINE GALLE, LPN, KIMBERLY RYAN, LPN, CARINA GROSS, LPN, AND KENDAL JEMIOLA, ASSISTANT REGIONAL MANAGER**

## COMMON LAW NEGLIGENCE

192.    Paragraphs I through 191, above, are fully incorporated by reference.

193.    As a direct and proximate result of Defendants' deliberate indifference to Ms. Redclift's constitutional rights, as set forth herein, Ms. Redclift was provided with the opportunity to commit self-harm and suicide while incarcerated within the Schuylkill County Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death from hanging.

194.    At all times relevant, Defendant PrimeCare provided comprehensive medical services to the Schuylkill County Prison, including but not limited to, staffing and training of prison nursing and medical personnel, formulating and enforcing policy and procedure regarding medical issues, performing inmate medical evaluations, administering and monitoring the inmate screening program, and distributing medications to the inmates.

195.    At all times relevant, Defendant PrimeCare acted both directly and through its' agents, employees and ostensible agents, including both identified and unidentified individual defendants.

196.    Alternatively, at all times relevant, the Medical Staff Defendants were agents, servants, ostensible agents of Defendant PrimeCare, acting within the course and scope their employment in providing nursing and medical services to the inmates at Schuylkill County Prison.

197.    As an alternative Cause of Action, Defendant PrimeCare and The Medical Staff Defendants owed a duty of reasonable care to Ms. Redclift, as an inmate of the Schuylkill County Prison who was under the complete custody, control, and care of all Defendants during her incarceration.

198.    As an alternative Cause of Action, the injuries and damages to Plaintiff and Ms. Redclift were caused by the negligence, carelessness and deviations from accepted standards of care of Defendant PrimeCare and The Medical Staff Defendants, in the following regards:

a.  Failing to observe, supervise, control and monitor Ms. Redclift's cell so as to detect or prevent suicide or suicide attempts;

b.  Failing to properly administer mental health and suicide screenings to inmates, including Ms. Redclift;

c.  Failing to follow policies and procedures in the administration of mental health and suicide screening to inmates, including Ms. Redclift;

d.  Failing to properly and adequately monitor, evaluate, control and observe Ms. Redclift, despite knowing that she suffered from post-traumatic stress disorder, depression and bipolar disorder-type 2 prior to and at the time of her incarceration at the Schuylkill County Prison;

e.  Failing to properly and adequately monitor, evaluate control and observe Ms. Redclift, despite knowing that she had a history of suicide attempts;

f.  Failing to properly and adequately monitor, evaluate, control and observe Ms. Redclift, despite knowing that she was committed to numerous psychiatric hospitals throughout her lifetime;

g.  Failing to properly and adequately monitor, evaluate, control and observe Ms. Redclift's mental health, together with the psychological effects of her arrest, detention and admittance to the Schuylkill County Prison;

h.  Failing to properly and adequately monitor, evaluate, control and observe Ms. Redclift, despite knowing that she was under the care of a psychiatrist for her mental health disorders prior to and at the time of her incarceration at the Schuylkill County Prison;

i.  Failing to properly and adequately monitor, evaluate, control and observe Ms. Redclift, despite knowing that she was currently on medication for mental illness prior to and at the time of her incarceration at the Schuylkill County Prison;

j.  Failing to properly and adequately monitor, evaluate, control and observe Ms. Redclift, despite knowing that she felt the need to treat with a mental health provider while incarcerated at the Schuylkill County Prison.

k.  Failing to ensure that Ms. Redclift was properly examined and/or received necessary and timely follow up treatment with a qualified health care provider to address Ms. Redclift's mental health illnesses while incarcerated as the Schuylkill County Prison;

l.  Failing to properly and sufficiently ensure that Ms. Redclift was placed on suicide watch and/or in a proper holding cell to prevent suicide and/or attempted suicide while incarcerated at the Schuylkill County Prison;

m.  Failing to ensure immediate referral of Ms. Redclift to a psychiatric facility instead of leaving the person unhand cuffed in a cell with implements with which to commit suicide;

n.  Failing to ensure that Ms. Redclift did not have access to potential implements used to commit suicide (clothing, sheets, shoe laces) while incarcerated at the Schuylkill County Prison;

o.  Failing to ensure removal of potential implements used to commit suicide (clothing, sheets, shoe laces) prior to assigning Ms. Redclift to Cell-Block B;

p.  Failing to properly and sufficiently perform tape visual monitoring and actual observation of Ms. Redclift while incarcerated at the Schuylkill County Prison;

q.  Failing to timely and adequately evaluate, re-evaluate or alter their course of care for Mrs. Redclift after it became obvious that factors affecting her condition had changed and after it became obvious that she was not receiving the requisite care that was appropriate for her;

r.  Failing to timely and accurately follow procedures, customs, and/or protocols requiring them to document and communicate with each other, PrimeCare personnel, and prison personnel relative to Mrs. Redclift's mental health and suicide risk factors, and relative to their physical observations of Mrs. Redclift

s.  Failing to properly approve and administer psychotropic medication to Ms. Redclift despite knowing that she had a history of mental illness as was currently taking medication to control her mental health illness prior to her incarceration at the Schuylkill County Prison.

199. In addition to the above, as an alternative cause of action, Defendants, Prime Care Medical, Inc. and the Medical Staff Defendants acted with negligence, carelessness, and deviated from accepted standards of care in the following regards:

a. Adopting and condoning a known pattern, practice and/or policy of inadequate observation and supervision of inmates in their care, custody, and control, including those who are suffering from mental health illness and/or have exhibited suicidal tendency, such as Ms. Redclift'

b. Adopting and condoning a known pattern, practice, and/or policy of permitting inadequate supervision of the correctional and medical staff;

c. Failing to ensure that the medical personnel and correctional officers provide an adequate and thorough monitoring, screening and observation of inmates suffering from mental illness, including Ms. Redclift;

d. Failing to ensure that the medical personnel and correctional officers provide an adequate and thorough monitoring, screening and observation of the administration of medications to inmates, including Ms. Redclift;

e. Adopting and condoning a known pattern, practice, and a policy of permitting inadequate supervision of inmates with mental health issues and/or diagnosis to ensure and prevent suicide or attempted suicide of inmates;

f. Failing to train the correctional officers and medical personnel in the correct and proper monitoring of inmates with known mental health illnesses and/or diagnosis;

g. Failing to train the correctional officers and medical personnel in the proper procedures for monitoring inmates with mental health issues and/or diagnosis to prevent suicide and/or attempted suicides of inmates while in their cells, including Ms. Redclift;

h. Failing to train the correctional officers and medical personnel in the proper procedures for monitoring, evaluating and observing inmates, with mental health issues and the psychological effects that arrest, detention and admittance to the Schuylkill County Prison has on the inmate, including Ms. Redclift;

i. Failing to enact and/or follow policies and procedures at Schuylkill Prison for requiring monitoring of suicidal inmates;

j. Failing to enact and/or follow policies and procedures at Schuylkill Prison for requiring monitoring of medication/administration process to inmates;

k.  Failing to enact and/or follow policies and procedures at Schuylkill Prison requiring monitoring of cells of inmates with mental health issues, mental health diagnosis, and/or prior attempts at suicide;

l.  Failing to enact and/or follow policies and procedures at Schuylkill Prison for requiring that a physician examine inmates with mental health issues and/or diagnosis in a timely manner;

m. Failing to enact and/or follow policies and procedures at Schuylkill Prison Requiring that a competent and properly trained medical personnel examine and screen inmates with mental health illnesses;

n.  Failing to enact and/or follow policies and procedures at Schuylkill Prison requiring that inmates, such as Ms. Redclift are offered prompt and timely psychiatric evaluation and/or re-evaluation when initial screenings establish that the inmate suffers from a history of mental health issues and suicide attempts;

o.  Failing to enact and/or follow policies and procedures at Schuylkill Prison Requiring that correctional officers and/or medical personnel inquire into the mental health capacity of the inmate with the arresting officer and/or the inmate's family prior to assignment to general population;

p.  Failing to enact and/or follow policies and procedures at Schuylkill Prison requiring that correctional officers and/or medical personnel ask or obtain from the arresting officer information regarding the arrestee/inmate's mental health capacity.

q.  Failing to enact and/or follow policies and procedures at Schuylkill Prison that ensure inmates are housed in the appropriate cell to prevent attempted suicide and/or suicide.

r.  Failing to enact and/or follow policies and procedures at Schuylkill Prison that ensure that inmates are not provided with implements to commit suicide in their cell.

200.   As an alternative cause of action, the negligence, carelessness, and deviations, and applicable standard of care of the Medical Staff Defendants were done during the course and scope of their employment, agency, servitude and/or ostensible agency with Defendant, Prime Care Medical, Inc. as a result of which this latter Defendant is vicariously liable to Plaintiff.

201.   As a direct and proximate resolve of Defendants' negligence, carelessness, and deviations of applicable standard of care, as set forth herein, Ms. Redclift was provided with the

instrumentality and the ability to commit suicide while an inmate within the Schuylkill Prison, resulting in serious physical injury, pain and suffering, mental anguish, and death by hanging.

WHEREFORE, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of one hundred fifty thousand dollars ($150,000.00), plus punitive damages, reasonable attorney's fees and costs, and such other and further relief as this Court deems appropriate.

## COUNT VIII

### PLAINTIFF VS. ALL DEFENDANTS

### WRONGFUL DEATH ACT 42 PA. C.S. §8301

202.    Paragraphs 1-201, above, are fully incorporated by reference.

203.    As a result of the deliberate indifference to Ms. Redclift's constitutional rights and negligence on the part of Defendants, as described more fully above, Ms. Redclift, age 48 years, died of a hanging while an inmate at the Schuylkill County Prison, on January 8, 2020.

204.    Plaintiff's decedent did not bring any action during her lifetime, nor has any other action for the death of Plaintiff's decedent been commenced against Defendants herein.

205.    Plaintiff's decedent died intestate. The intestate heirs to her estate consist of her husband, Sean Redclift, DOB: November 1, 1970; and children, Savannah Williams, DOB: September 26, 1993; Hailey Redclift, DOB: July 25, 1997; and, Alexander Redclift, DOB: June 6, 1999.

206.    Plaintiff, Sean Redclift, individually, and as administrator of the estate of Stacy Redclift, has a right to and does bring this action under and by virtue of the Act of the Legislature of the Commonwealth of Pennsylvania known as the Wrongful Death Act, 42 Pa. C.S.A. §8301 and 20 Pa. C.S.A. §3373.

207.     As a direct and proximate result of the acts of all Defendants, as more fully set forth above, Plaintiff and the wrongful death beneficiaries have, and will continue to be deprived of the affection, aid, society, and comfort of Ms. Redclift.

208.     Plaintiff claims damages for the pecuniary losses suffered by Plaintiff by reason of the death of Stacy Redclift, as well as the loss of affection, aide, society, and comfort of Ms. Redclift, and reimbursement of hospital, medical, and funeral expenses, expenses of estate administration, and other expenses incurred in connection therewith, and all other damages compensable under the Pennsylvania Wrongful Death Act.

209.     Plaintiff individually, and on behalf of the wrongful death beneficiaries, claim entitlement to seek compensation for the monetary support that Ms. Redclift, would have provided during her lifetime.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

## COUNT IX

### PLAINTIFF VS. ALL DEFENDANTS

### SURVIVAL ACTION 42 PA. C.S.A.§8302

210.     Paragraphs through 209, above, are fully incorporated by reference.

211.     Plaintiff, Sean Redclift, as Administrator of the Estate of Stacy Redclift, deceased, brings this action on behalf of the estate by virtue of the Act of Legislature of the Commonwealth of Pennsylvania, known as the Survival Act 42 Pa. C.S.A. §8302 and 22 Pa. C.S.A. §3371 and 3373.

212.    Plaintiff, Sean Redclift, as Administrator of the Estate of Stacy Redclift, claims on behalf of the estate of Stacy Redclift, damages for pain and suffering undergone by Ms. Redclift as a result of the deliberate indifference to Ms. Redclift's civil rights and negligence of Defendants herein, up to and including the time of her death.

213.    As a result of the death of Stacy Redclift, her estate has been deprived of the economic value of Ms. Redclift's life during the period of her life expectancy, and Plaintiff, as Administrator of the Estate of Stacy Redclift, deceased, claims damages for the pecuniary loss suffered by the estate as a result of Ms. Redclift's death, as well as for the conscious pain and suffering undergone by the Ms. Redclift up to and including the time of her death, and for all other damages permitted by the Pennsylvania Survivorship Statute.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory damages against each Defendant jointly and severally, in an amount in excess of One Hundred Fifty Thousand and 0/100 dollars ($150,000.00), plus punitive damages, reasonable attorney fees and costs, and such other and further relief as this court deems appropriate.

FANELLI, EVANS & PATEL, P.C.

By:____/s/ Eric M. Prock_____
    ERIC M. PROCK, ESQUIRE
     I.D. No. #208315
    JAMES J. AMATO, ESQUIRE
    I.D. No. #203523
    No. 1 Mahantongo St.
    Pottsville, PA 17901
    (570) 622-2455
    eprock@feplawyers.com
    jamato@feplawyers.com
    *Attorneys for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

FANELLI, EVANS, & PATEL, P.C.


BY: <u>/s/ *Eric Prock*</u>
ERIC PROCK, ESQUIRE
*Attorney for Plaintiff*